STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott E. ZIEGLER, Defendant-Appellant.

Supreme Court

*No. 2010AP2514–CR. Oral argument April 17, 2012.
—Decided July 3, 2012.*

2012 WI 73

(Also reported in 816 N.W.2d 238.)

256

For the defendant-appellant there were briefs (in the court of appeals) by *Christopher William Rose* and *Rose & Rose,* Kenosha and oral argument by *Christopher William Rose.*

For the plaintiff-respondent the cause was argued by *Aaron R. O'Neil,* assistant attorney general, with whom on the brief (in the court of appeals) was *J.B. Van Hollen,* attorney general.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This appeal is before the court on certification by the court of appeals pursuant to Wis. Stat. § 809.61 (2009–10). Wisconsin Stat. § 948.31(2) (2005–06)[1] prohibits a person from interfering with the custody of a child. In *State v. Bowden,* 2007 WI App 234, ¶ 18, 306 Wis. 2d 393, 742 N.W.2d 332, the court of appeals interpreted the phrase "withholds a child for more than 12 hours from the child's parents" in § 948.31(2) as "address[ing] a situa-

---

[1] Wisconsin Stat. § 948.31(2) (2005–06) provides:

> Whoever causes a child to leave, takes a child away or withholds a child for more than 12 hours from the child's parents or, in the case of a nonmarital child whose parents do not subsequently intermarry under s. 767.803, from the child's mother or, if he has been granted legal custody, the child's father, without the consent of the parents, the mother or the father with legal custody, is guilty of a Class I felony. This subsection is not applicable if legal custody has been granted by court order to the person taking or withholding the child.

All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

tion where the person who takes the child has some initial permission to do so." In the instant certification, however, the court of appeals expressed its disagreement with its interpretation of § 948.31(2), explaining that following *Bowden* would compel it to overturn the defendant's conviction for interference with child custody despite the conviction appearing statutorily sound. The court of appeals therefore asked us to determine whether its interpretation of § 948.31(2), as set forth in *Bowden,* is contrary to the plain language of the statute.

¶ 2. Stemming from allegations involving four teenage girls, the State charged the defendant, Scott Ziegler (Ziegler), with one count of repeated first-degree sexual assault of a child; one count of interference with child custody; two counts of child enticement; one count of second-degree sexual assault by use of force; two counts of physical abuse of a child, intentionally causing bodily harm; and seven counts of second-degree sexual assault of a child.

¶ 3. A jury found Ziegler guilty of each of the 14 counts, and the circuit court entered judgment on the jury verdict. The circuit court sentenced Ziegler to a total of 310 years of imprisonment, but several of the 14 sentences were structured to run concurrently. As a result, Ziegler would serve a total of 35 years in initial confinement and 20 years on extended supervision.

¶ 4. Ziegler appealed, challenging his conviction on four grounds. First, relying on *Bowden,* Ziegler argued that there was insufficient evidence to convict him of interference with child custody. Second, he contended that five of the seven counts of second-degree sexual assault of a child are multiplicitous in violation of his constitutional protection against double jeopardy. Third, Ziegler asserted that the admission at trial of his mug

shot[2] deprived him of his right to a fair trial. Fourth and finally, Ziegler maintained that the circuit court erroneously exercised its discretion in ordering him to wear a stun belt at trial.

¶ 5. The court of appeals certified Ziegler's appeal to this court, asking us to examine its interpretation of Wis. Stat. § 948.31(2) in *Bowden.*

¶ 6. We granted the court of appeals' certification and now affirm the judgment of the circuit court.

¶ 7. First, in answer to the certified question, we conclude that the court of appeals' interpretation of the phrase "withholds a child for more than 12 hours from the child's parents" in Wis. Stat. § 948.31(2), as set forth in *Bowden,* is contrary to the plain language of the statute. We therefore withdraw from *Bowden* any language that suggests that § 948.31(2) requires the State to prove that the defendant had the parents' "initial permission" to take the child. The remainder of *Bowden* retains its precedential value.[3]

¶ 8. Applying the appropriate interpretation of Wis. Stat. § 948.31(2) to the instant case, we determine

---

[2] A "mug shot" is the colloquial term for "[a] photograph of a person's face taken after the person has been arrested and booked." *Black's Law Dictionary* 1035 (7th ed. 1999).

[3] Because we are only withdrawing language from *State v. Bowden,* 2007 WI App 234, 306 Wis. 2d 393, 742 N.W.2d 332, rather than overruling the decision, we conclude that the rule in *Blum v. 1st Auto & Casualty Insurance Co.,* 2010 WI 78, ¶ 56, 326 Wis. 2d 729, 786 N.W.2d 78, which governs the precedential value of a prior court of appeals decision that this court subsequently overrules, is not implicated here. *See id.* (concluding that "a court of appeals decision *expressly overruled* by this court no longer retains any precedential value, unless this court expressly states that it is leaving portions of the court of appeals decision intact" (emphasis added)).

that the evidence was sufficient to convict Ziegler of interference with child custody.

¶ 9. Second, we conclude that Counts 10 through 14 of the information, each charging Ziegler with second-degree sexual assault of the same child, are not multiplicitous. The five offenses, while identical in law, are different in fact. We further conclude that Ziegler has failed to rebut the presumption that the legislature intended to permit cumulative punishments for the five offenses.

¶ 10. Third, we determine that the circuit court's admission at trial of Ziegler's mug shot did not deprive Ziegler of his right to a fair trial.

¶ 11. Fourth and finally, we conclude that the circuit court appropriately exercised its discretion in ordering Ziegler to wear a stun belt at trial.

## I. FACTUAL BACKGROUND

¶ 12. Ziegler owned a store in downtown Waukesha, Wisconsin that sold various sexual novelties and smoking paraphernalia, as well as pornographic magazines and videos. Prior to its closing in November 2007, the store, named "Twisted," was recognized as a hangout for juveniles.

¶ 13. On January 17, 2008, the City of Waukesha Police Department received a report from a county social worker that Ziegler was having sexual intercourse with 14–year-old Kaitlyn R. (Kaitlyn) and that Kaitlyn was planning to run away with him. The next day, on January 18, 2008, Kaitlyn's mother informed police that Kaitlyn did not return home from school.

¶ 14. Ten days later, on January 28, 2008, the police caught Ziegler leaving his residence with Kaitlyn. At the time, Kaitlyn was wearing a dog collar and leash.

¶ 15. Several friends of Kaitlyn's provided statements to the police, advising that Kaitlyn had disclosed to them that she frequently hung out with Ziegler and had sexual intercourse with him on numerous occasions. In exchange for sex, Ziegler allegedly provided Kaitlyn with alcohol and marijuana.

¶ 16. Samantha M. (Samantha), then 15 years old, informed the police that she too spent time at Ziegler's residence, smoking marijuana. Samantha recounted that on one occasion, in November 2007, Ziegler "grabbed her, put her over his knee and held her down by her arms and legs." Despite Samantha's resistance, Ziegler pulled down her pants and underwear and spanked her bare buttocks for approximately five minutes.

¶ 17. The accounts were largely reiterated by two of Ziegler's adult roommates. One indicated that he personally observed Ziegler spank and inappropriately touch underage girls. He reported that one girl in particular, 16–year-old Kari K. (Kari), stayed at Ziegler's residence for over a week in December 2007, getting drunk on vodka and high on marijuana. Ziegler's roommate described how he could hear Ziegler and Kari having sex through the walls of Ziegler's bedroom.

¶ 18. When interviewed by the police, Kari acknowledged that she had visited Ziegler's residence "approximately 50 to 100 times" since July 2007, often with Kaitlyn. She recalled consuming alcohol and drugs on every occasion and sleeping over "approximately 40 times." According to Kari, Ziegler had a rule that any female who spent the night had to sleep naked in his bedroom; when Kari objected, he spanked her bare buttocks with a wooden paddle. Kari advised that she often awoke to find Ziegler's fingers inside her vagina,

and on one occasion, Ziegler forced her to perform oral sex on him. Kari described another night when, pursuant to Ziegler's rule, both she and Kaitlyn were required to sleep naked with Ziegler. When Kari awoke, she observed Kaitlyn performing oral sex on Ziegler.

¶ 19. That same rule was recounted by 15–year-old Nicole V. (Nicole), who reported spending the night at Ziegler's residence in December 2007:

> [Ziegler] provided her with Adderall pills, and she was "high." She said that she was in [Ziegler's] bedroom with him, and the door was shut and locked from the inside. She said they were lying on the bed and she was trying to fall asleep when [Ziegler] started touching her breasts. She said that they started making out and both ended up taking off all of their clothing. She said [Ziegler] then placed his hands on top of and inside of her vagina. She said that his penis was erect, and he had her rub it with her hands. He then had her put her mouth on his penis, and she performed oral sex on him until he ejaculated in her mouth. She said that after this, [Ziegler] had her lay across his lap and he hit her on the buttocks with a wooden paddle.

## II. PROCEDURAL POSTURE

¶ 20. On July 1, 2008, the State filed an information charging Ziegler with the following 14 counts: (1) repeated first-degree sexual assault of Kaitlyn, in violation of Wis. Stat. §§ 948.02(1)[4] and

---

[4] Wisconsin Stat. § 948.02, "Sexual assault of a child," provides, in relevant part:

> (1) First degree sexual assault (a) In this subsection, "sexual intercourse" means vulvar penetration as well as cunnilingus, fellatio, or anal intercourse between persons or any intrusion of any inanimate object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required.
>
> . . . .

948.025(1)(b);[5] (2) interference with the custody of Kaitlyn, in violation of Wis. Stat. § 948.31(2); (3) enticement of Kaitlyn, in violation of Wis. Stat. § 948.07(3);[6] (4) enticement of Kari, in violation of § 948.07(3); (5) second-degree sexual assault of Kari, then 16 years old, in violation of Wis. Stat. § 940.225(2)(a);[7] (6) second-degree sexual assault of Kari, then 15 years old, in violation of Wis. Stat. § 948.02(2); (7) second-degree

(c) Whoever has sexual intercourse with a person who has not attained the age of 16 years by use or threat of force or violence is guilty of a Class B felony.

. . . .

(2) Second degree sexual assault. Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 16 years is guilty of a Class C felony.

[5] Wisconsin Stat. § 948.025, "Engaging in repeated acts of sexual assault of the same child," states, in relevant part: "(1) Whoever commits 3 or more violations under s. 948.02(1) or (2) within a specified period of time involving the same child is guilty of: . . . (b) A Class C felony if fewer than 3 of the violations were violations of s. 948.02(1)."

[6] Wisconsin Stat. § 948.07, "Child enticement," states, in relevant part:

Whoever, with intent to commit any of the following acts, causes or attempts to cause any child who has not attained the age of 18 years to go into any vehicle, building, room or secluded place is guilty of a Class D felony:

. . . .

(3) Exposing a sex organ to the child or causing the child to expose a sex organ . . . .

[7] Wisconsin Stat. § 940.225(2), "Second degree sexual assault," provides, in relevant part: "Whoever does any of the following is guilty of a Class C felony: (a) Has sexual contact or sexual intercourse with another person without consent of that person by use or threat of force or violence."

sexual assault of Samantha, in violation of § 948.02(2); (8) physical abuse of Samantha, in violation of Wis. Stat. § 948.03(2)(b);[8] (9) physical abuse of Kari, in violation of § 948.03(2)(b); (10) second-degree sexual assault of Nicole ("mouth to penis oral sex"), in violation of Wis. Stat. § 948.02(2); (11) second-degree sexual assault of Nicole ("digital penetration of vagina"), in violation of § 948.02(2); (12) second-degree sexual assault of Nicole ("touching breasts"), in violation of § 948.02(2); (13) second-degree sexual assault of Nicole ("hand to penis"), in violation of § 948.02(2); and (14) second-degree sexual assault of Nicole ("striking of buttocks"), in violation of § 948.02(2).[9]

¶ 21. On September 4, 2009, Ziegler filed a pre-trial motion to dismiss Counts 10 through 14 as multi-plicitous, arguing that the five alleged acts involving Nicole are so similar in fact that they may not properly be denominated separate crimes.

¶ 22. The circuit court denied Ziegler's motion at a hearing on October 12, 2009. The court reasoned that although the five counts comprise "a consecutive series of events," each of the five alleged acts is distinct in nature and "require[s] a separate, volitional act" on the part of Ziegler.

¶ 23. At that same hearing, the circuit court indicated that Ziegler would be wearing street clothes and a

_____

[8] Wisconsin Stat. § 948.03(2)(b) states that "[w]hoever intentionally causes bodily harm to a child is guilty of a Class H felony."

[9] The 14–count information was amended down from 19 counts after the circuit court dismissed three additional counts of physical abuse of a child and two additional counts of interference with child custody at the February 22, 2008, preliminary hearing and a June 30, 2008, pre-trial motion hearing, respectively.

stun belt at trial, in order to prevent any "problems." Ziegler's counsel objected, questioning whether the use of a stun belt was common practice. The circuit court explained that a stun belt is "commonly used" when a defendant is in custody, as it allows some restraint "without being readily apparent." Absent any tight clothing, the court remarked, the stun belt "should be [i]ndiscernible to the jurors."

¶ 24. Ziegler's trial began on October 19, 2009, and lasted four days. At the start of the first day, outside the jury's presence, the circuit court explained on the record that Ziegler was wearing borrowed clothing because his own clothes did not accompany him from the jail. While acknowledging defense counsel's complaint that the borrowed clothing was too big, the circuit court nevertheless commented that Ziegler was dressed "appropriate[ly]," wearing "a white shirt and tie and a pair of dark trousers and dress type of shoes." In addition, the circuit court expressly observed that Ziegler was not wearing any visible restraints: "Mr. Ziegler also has the stun belt, which I believe is on his leg, so there are no visible restraints. There's no manacles, there are no shackles. There's no belly chain." When asked whether he had any other concerns relative to Ziegler's appearance, defense counsel privately consulted with Ziegler and then responded, "We're fine with the clothes situation."

¶ 25. Each of the four alleged victims testified at trial. Kaitlyn testified that she first met Ziegler at his store in the fall of 2007. According to Kaitlyn, her visits to Twisted became a pattern: "[T]hat's what I'd do, I'd run away and I'd show up at Twisted." Ziegler eventually began driving Kaitlyn from Twisted to his house because, in her words, she "had nowhere else to go." Kaitlyn indicated that she went to Ziegler's residence "a

lot," approximately 10 or 15 different times. If she stayed the night, she was required to sleep in Ziegler's bedroom and "had to sleep with no clothes on"; "[i]f [she] didn't sleep in his room, he'd get angry and kick [her] out the next day."

¶ 26. Kaitlyn described several instances of sexual contact and intercourse with Ziegler, including Kaitlyn "giving him oral sex" and Ziegler "putting his fingers in [her] vagina," "feeling [her] butt," "tr[ying] to have anal sex with [her]," and "touching [her] leg and [her] private areas." According to Kaitlyn, she had sexual contact with Ziegler "[p]retty much every time [she] stayed over there." When asked why she continued to return to his house, Kaitlyn explained, "I just wanted somewhere to get away. . . . And he had drugs, and I wanted drugs, so I figured I'd put up with him just to get what I wanted out of it." By the time the police caught Ziegler leaving his residence with Kaitlyn on January 28, 2008, Kaitlyn had been "staying at his house" for over a week.

¶ 27. Kaitlyn's mother, Tammy R. (Tammy), also testified at trial. Tammy reported that Kaitlyn was missing from January 18, 2008, until January 28, 2008, when she was located by police. When asked whether Kaitlyn had Tammy's permission to stay at Ziegler's residence, Tammy responded, "No."

¶ 28. The State introduced Ziegler's mug shot in the course of Samantha's testimony. The State asked Samantha whether she knew an individual by the name of Scott Ziegler, and she answered in the affirmative. Samantha further identified Ziegler as the owner of Twisted. However, when asked whether Ziegler was in the courtroom, Samantha responded, "I don't see him." Ziegler's counsel immediately objected to Samantha's

testimony, citing a lack of foundation. The circuit court overruled the objection in a sidebar conference.

¶ 29. The State introduced Ziegler's mug shot at the close of its direct examination of Samantha, asking Samantha whether she recognized the person in the photograph. Samantha identified the person as "Scott Ziegler."

¶ 30. In a subsequent offer of proof, outside the jury's presence, Ziegler's counsel reiterated his objection to Samantha's testimony and requested that Ziegler's mug shot not be published to the jury. The circuit court again overruled the objection, reasoning that the State established a foundation for Samantha's testimony through her identification of Ziegler as the owner of Twisted and her familiarity with Ziegler's residence. While it admitted Ziegler's mug shot into evidence, the circuit court stated that it had no intention of publishing the mug shot to the jury.

¶ 31. The State further authenticated the mug shot through the testimony of Detective Shelley Fisher (Detective Fisher) of the City of Waukesha Police Department. Detective Fisher identified the mug shot as Ziegler's booking photo, taken after his arrest on January 28, 2008.

¶ 32. The jury returned its verdict on October 22, 2009, finding Ziegler guilty of each of the 14 counts.

¶ 33. On December 23, 2009, the circuit court entered judgment on the jury verdict. The circuit court sentenced Ziegler to a total of 310 years of imprisonment, but several of the 14 sentences were structured to run concurrently. As a result, Ziegler would serve a total of 35 years in initial confinement and 20 years on extended supervision.

¶ 34. Ziegler appealed, challenging his conviction on four grounds. First, relying on *Bowden,* Ziegler

argued that there was insufficient evidence to convict him of interfering with Kaitlyn's custody. Second, he contended that the circuit court erred in denying his motion to dismiss Counts 10 through 14 as multiplicitous. Third, Ziegler asserted that the admission of his mug shot deprived him of his right to a fair trial. Fourth, Ziegler maintained that the circuit court erroneously exercised its discretion in ordering him to wear a stun belt at trial.

¶ 35. The court of appeals certified Ziegler's appeal to this court, expressing its disagreement with its own interpretation of Wis. Stat. § 948.31(2) in *Bowden.* The court of appeals explained that its interpretation of § 948.31(2) seems to add language, namely, an element, to the statute. Denying that its interpretation of § 948.31(2) was dicta, the court of appeals acknowledged that it was bound by *Bowden* and thereby compelled to overturn Ziegler's conviction for interference with child custody, even though the conviction appears statutorily sound. Accordingly, the court of appeals certified Ziegler's appeal to this court, asking us "to determine whether *Bowden*'s interpretation is contrary to the plain language of the statute."

¶ 36. We granted the court of appeals' certification and accepted for consideration all four issues raised before the court of appeals.

### III. STANDARD OF REVIEW

¶ 37. The interpretation and application of Wis. Stat. § 948.31(2) present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court. *See Heritage Farms, Inc. v. Markel Ins. Co.,* 2012 WI 26, ¶ 24, 339 Wis. 2d 125, 810 N.W.2d 465. We also independently review whether the evidence presented to the jury was

277

sufficient to convict Ziegler of interfering with the custody of Kaitlyn. *See State v. Hanson,* 2012 WI 4, ¶ 15, 338 Wis. 2d 243, 808 N.W.2d 390.

¶ 38. Likewise, whether Counts 10 through 14 of the information are multiplicitous in violation of the federal and state constitutions is a question of law subject to our independent review. *See State v. Patterson,* 2010 WI 130, ¶ 12, 329 Wis. 2d 599, 790 N.W.2d 909; *State v. Multaler,* 2002 WI 35, ¶ 52, 252 Wis. 2d 54, 643 N.W.2d 437.

¶ 39. We will not disturb the circuit court's decision to admit at trial Ziegler's mug shot unless the circuit court erroneously exercised its discretion. *State v. Ringer,* 2010 WI 69, ¶ 24, 326 Wis. 2d 351, 785 N.W.2d 448. " 'A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record.' " *Johnson v. Cintas Corp. No. 2,* 2012 WI 31, ¶ 22, 339 Wis. 2d 493, 811 N.W.2d 756 (quoting *260 N. 12th St., LLC v. DOT,* 2011 WI 103, ¶ 38, 338 Wis. 2d 34, 808 N.W.2d 372). At the same time, whether the admission of the mug shot violated Ziegler's right to due process presents a question of law that we review de novo. *See State v. Burns,* 2011 WI 22, ¶ 23, 332 Wis. 2d 730, 798 N.W.2d 166.

¶ 40. We also will not disturb the circuit court's decision to order Ziegler to wear a stun belt at trial unless the circuit court erroneously exercised its discretion. *See State v. Grinder,* 190 Wis. 2d 541, 550–51, 527 N.W.2d 326 (1995).

## IV. ANALYSIS

### A

¶ 41. We granted the court of appeals' certification in order to determine whether the court of appeals' interpretation of Wis. Stat. § 948.31(2), as set forth in *Bowden,* is contrary to the plain language of the statute.

¶ 42. Our canons of statutory interpretation are often stated and well understood. " 'The purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect.' " *Heritage Farms,* 339 Wis. 2d 125, ¶ 26 (quoting *State ex rel. Kalal v. Circuit Court for Dane Cnty.,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110). To that end, statutory interpretation begins with the language of the statute. *Kalal,* 271 Wis. 2d 633, ¶ 45. With the exception of technical or specially-defined words, statutory language is given its common and ordinary meaning. *Id.* If the language is plain, our inquiry ends. *Id.*

¶ 43. At the same time, ascertaining the plain meaning of a statute requires more than focusing on a single sentence or portion thereof. *Teschendorf v. State Farm Ins. Cos.,* 2006 WI 89, ¶ 12, 293 Wis. 2d 123, 717 N.W.2d 258. We therefore interpret statutory language in the context in which it is used, "not in isolation but as part of a whole." *Kalal,* 271 Wis. 2d 633, ¶ 46. In addition, we must construe statutory language reasonably. *Id.* An unreasonable interpretation is one that yields absurd results, *id.,* or contravenes the statute's manifest purpose, *id.,* ¶ 49.

¶ 44. In this case, Ziegler was charged with and convicted of one count of interference with child custody in violation of Wis. Stat. § 948.31(2). Section 948.31(2) states, in relevant part, that "[w]hoever causes a child to leave, takes a child away or withholds a child for more than 12 hours from the child's parents . . . without the consent of the parents . . . is guilty of a Class I felony."

¶ 45. The court of appeals interpreted Wis. Stat. § 948.31(2) in *Bowden,* concluding that the jury was presented sufficient evidence to find that the defendant caused two children to leave their parent without the parent's consent. 306 Wis. 2d 393, ¶ 1. In that case, the jury was presented evidence that the 55–year-old defendant approached two boys, eleven- and five-year-old brothers, as they walked home from school, engaging them in conversation about sports and repeatedly asking them to go with him to his house. *Id.,* ¶¶ 2–3. The boys initially resisted, explaining that their mother was expecting them at home. *Id.,* ¶ 3. However, fearful that the defendant might hurt them, the boys eventually followed him to his house and went inside. *Id.* Once at the house, the defendant gave the boys two basketballs and a drawing board. *Id.,* ¶ 6. It was estimated that the boys were inside the defendant's house for as long as 45 minutes before friends of the defendant's eventually walked the boys home. *Id.,* ¶¶ 5–6.

¶ 46. The State charged the defendant with two counts of interference with child custody in violation of Wis. Stat. § 948.31(2), alleging that the defendant caused the boys to leave their parent without the parent's consent. *Id.,* ¶ 7. The jury found the defendant guilty of both counts. *Id.,* ¶ 9.

¶ 47. The defendant challenged his conviction on appeal, contending that he could not have "cause[d] [the

children] to leave" their parent within the meaning of Wis. Stat. § 948.31(2) because the boys were not with their mother when the incident occurred. *See id.,* ¶¶ 11, 17. In support of his interpretation of § 948.31(2), the defendant pointed to the statute's third method of interference, namely, " 'withhold[ing] a child for more than 12 hours' " from the child's parents. *Id.,* ¶ 17 (quoting § 948.31(2)). The third method of interference, the defendant posited, contemplates a circumstance in which the child is *not* with his or her parent, and therefore, the other two methods of interference—"caus[ing] a child to leave" or "tak[ing] a child away"—must apply only to those circumstances in which the child initially *is* with his or her parent. *Id.,* ¶¶ 17–18.

¶ 48. The court of appeals rejected the defendant's interpretation of Wis. Stat. § 948.31(2), denying that the third method of interference focuses on the presence of the child's parents. *Id.,* ¶ 18. Instead, the court of appeals stated, "[t]he withholding method addresses a situation where the person who takes the child has some initial permission to do so." *Id.* By contrast, the court of appeals explained, "[t]he other two methods speak to situations where the parent has given no permission to the person who 'causes a child to leave' or 'takes a child away.' " *Id.*

¶ 49. In *Bowden,* the court of appeals held that the evidence was sufficient to sustain the jury's finding that the defendant caused the boys to leave their mother without her consent. *Id.,* ¶ 19. The jury was presented evidence that the defendant approached the boys; lured them into conversation; and, without permission from their mother, insisted that they deviate from their route home. *Id.* Accordingly, the court of appeals concluded that the defendant's conduct, despite being "sweetened with sports talk and basketballs,"

"amount[ed] to mental manipulation of a child by doing things to persuade the child to leave the parent." *Id.*

¶ 50. The instant case was charged under the third method of interference enumerated in Wis. Stat. § 948.31(2): the State alleged, and the jury found, that between January 18, 2008, and January 28, 2008, Ziegler withheld Kaitlyn for more than 12 hours from her parents without her parents' consent. Relying on *Bowden,* Ziegler now argues that the evidence was insufficient to sustain the jury's finding that he withheld Kaitlyn within the meaning of § 948.31(2) because it is undisputed that he did not have her mother's "initial permission" to take Kaitlyn. *See* 306 Wis. 2d 393, ¶ 18. That is, Kaitlyn's mother, Tammy, specifically testified that she did not give Kaitlyn permission to stay at Ziegler's residence in January 2008 and in fact, at the time, did not even know who Ziegler was.

¶ 51. In its certification, the court of appeals did not quarrel with Ziegler's application of *Bowden.* Instead, the court of appeals expressed its disagreement with its own interpretation of Wis. Stat. § 948.31(2) in *Bowden,* acknowledging that "there is nothing in the statutory language to indicate that in order to withhold custody from a parent, a defendant must have had 'initial permission' from the parent to take the child." We agree.

⬛⬛ ⬛

¶ 52. Pursuant to the plain language of Wis. Stat. § 948.31(2), a person is guilty of interference with child custody if, without the consent of the child's parents, the person either (a) "causes a child to leave" the child's parents, (b) "takes a child away" from the child's parents, or (c) "withholds a child for more than 12 hours" from the child's parents. *See also* Wis JI—Criminal 2167. Specific to the third method of interference, therefore, the State must prove three elements: (1) on the date of the alleged

offense, the child was under the age of 18 years; (2) the defendant withheld the child for more than 12 hours from the child's parents; and (3) the child's parents did not consent.

¶ 53. As the court of appeals correctly acknowledged in its certification, nothing in the text of Wis. Stat. § 948.31(2) suggests that the State must also prove that the defendant had the parents' initial permission to take the child. Indeed, the statute's only arguable reference to permission comes in the form of the phrase "without the consent of the parents"—a phrase that requires the State to prove that the defendant was *without* the parents' permission to withhold their child for more than 12 hours. Moreover, the common and ordinary meaning of the phrase "withholds a child . . . from the child's parents" does not suggest that the actor necessarily had the parents' initial permission to take the child. The word "withhold" is commonly understood to mean "[t]o keep in check; restrain" or "[t]o refrain from giving, granting, or permitting." *The American Heritage Dictionary of the English Language* 2050–51 (3d ed. 1992). Thus, a defendant withholds a child from the child's parents within the meaning of § 948.31(2) if the defendant restrains the child or otherwise refrains from giving the child to the child's parents, irrespective of whether the defendant had the parents' initial permission to take the child.

¶ 54. Accordingly, in answer to the certified question, we conclude that the court of appeals' interpretation of the phrase "withholds a child for more than 12 hours from the child's parents" in Wis. Stat. § 948.31(2), as set forth in *Bowden,* is contrary to the plain language of the statute. We therefore withdraw from *Bowden* any language that suggests that § 948.31(2) requires the State to prove that the defendant had the parents'

"initial permission" to take the child. The remainder of *Bowden* retains its precedential value.[10]

¶ 55. Applying the appropriate interpretation of Wis. Stat. § 948.31(2) to the instant case, we conclude that the evidence was sufficient to sustain the jury's finding that Ziegler withheld Kaitlyn for more than 12 hours from her parents without her parents' consent.

¶ 56. A defendant bears a heavy burden in attempting to set aside a jury's verdict on the grounds of insufficient evidence. *Hanson,* 338 Wis. 2d 243, ¶ 31; *State v. Booker,* 2006 WI 79, ¶ 22, 292 Wis. 2d 43, 717 N.W.2d 676. Evidence is insufficient to sustain a conviction "only if the evidence, when viewed most favorably to the State, 'is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'" *Booker,* 292 Wis. 2d 43, ¶ 22 (quoting *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990)).

¶ 57. In this case, Kaitlyn testified that beginning on January 18, 2008, when she was only 14 years old, she stayed with Ziegler at his residence for over a week. The jury was not presented any evidence tending to show that Ziegler ever offered or attempted to bring Kaitlyn back to her mother, Tammy, or to otherwise contact Tammy. Instead, by all accounts, Ziegler wanted Kaitlyn to stay with him, requiring her to sleep naked in his bedroom and perform sexual favors in exchange for drugs and alcohol. Indeed, the pair was not separated until January 28, 2008, when the police caught Ziegler leaving his residence with Kaitlyn in tow, wearing a dog

---

[10] *See supra* note 3.

collar and leash. Tammy testified that Kaitlyn was missing from January 18, 2008, until January 28, 2008, and that she never gave permission for Kaitlyn to stay at Ziegler's residence. Viewing such evidence in the light most favorable to the State, we have little difficulty determining that the evidence was sufficient for the jury to find beyond a reasonable doubt that Ziegler withheld Kaitlyn, then 14 years old, for more than 12 hours from her mother without her mother's consent. That is, the jury could have reasonably found that between January 18, 2008, and January 28, 2008, Kaitlyn stayed with Ziegler at his residence and that over Tammy's objection, Ziegler either restrained Kaitlyn or refrained from giving Kaitlyn to Tammy for a period of more than 12 hours.

B

¶ 58. Ziegler also contends that the circuit court erred in denying his motion to dismiss Counts 10 through 14 of the information as multiplicitous. Analogizing the five counts with those at issue in *State v. Hirsch,* 140 Wis. 2d 468, 410 N.W.2d 638 (Ct. App. 1987), Ziegler argues that the five alleged acts, each involving Nicole, comprised one continuous episode and therefore could not properly be charged as five separate crimes.

¶ 59. The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and its parallel provision in the Wisconsin Constitution, Article I, Section 8(1), prohibit multiple punishments for the same offense.[11] When a defendant is charged in more than one count for a single offense, the counts are

---

[11] The Fifth Amendment of the United States Constitution provides, in relevant part, that "nor shall any person be subject

deemed impermissibly multiplicitous. *State v. Rabe,* 96 Wis. 2d 48, 61, 291 N.W.2d 809 (1980).

¶ 60. We review multiplicity claims according to a well-established two-pronged methodology. First, the court determines whether the offenses are identical in law and fact using the "elements-only" test set forth in *Blockburger v. United States,* 284 U.S. 299, 304 (1932). *Patterson,* 329 Wis. 2d 599, ¶ 12; *State v. Davison,* 2003 WI 89, ¶ 43, 263 Wis. 2d 145, 666 N.W.2d 1. Under the "elements-only" test, two offenses are identical in law if one offense does not require proof of any fact in addition to those which must be proved for the other offense. *See Blockburger,* 284 U.S. at 304. Still, offenses identical in law are not necessarily identical in fact. *See State v. Eisch,* 96 Wis. 2d 25, 30–31, 291 N.W.2d 800 (1980). Two offenses, which are legally identical, are not identical in fact if the acts allegedly committed are sufficiently different in fact to demonstrate that separate crimes have been committed. *See id.* at 31; *Multaler,* 252 Wis. 2d 54, ¶¶ 56–57.

¶ 61. The results of the "elements-only" test determine the presumption under which we analyze the second prong of our methodology. *Patterson,* 329 Wis. 2d 599, ¶ 15. If the offenses are identical in law and fact, a presumption arises that the legislature did not intend to authorize cumulative punishments. *Id.; Davison,* 263 Wis. 2d 145, ¶ 43. The State may rebut

for the same offense to be twice put in jeopardy of life or limb." Likewise, Article I, Section 8(1) of the Wisconsin Constitution mandates that "no person for the same offense may be put twice in jeopardy of punishment." This court traditionally views these two clauses as identical in scope and purpose. *State v. Davison,* 2003 WI 89, ¶ 18, 263 Wis. 2d 145, 666 N.W.2d 1.

that presumption only by a clear indication of contrary legislative intent. *Davison,* 263 Wis. 2d 145, ¶ 43.

¶ 62. Conversely, if the offenses are different in law or fact, the presumption is that the legislature intended to permit cumulative punishments. *Patterson,* 329 Wis. 2d 599, ¶ 15; *Davison,* 263 Wis. 2d 145, ¶ 44. At this juncture, we are no longer concerned with a double jeopardy violation but instead a potential due process violation. *See Davison,* 263 Wis. 2d 145, ¶ 33; *State v. Trawitzki,* 2001 WI 77, ¶ 22, 244 Wis. 2d 523, 628 N.W.2d 801. If the offenses are different in law or fact, the defendant has the burden of demonstrating that the offenses are nevertheless multiplicitous on grounds that the legislature did not intend to authorize cumulative punishments. *Patterson,* 329 Wis. 2d 599, ¶ 17; *Davison,* 263 Wis. 2d 145, ¶ 45. If the defendant succeeds, he or she has a legitimate due process claim. *See Davison,* 263 Wis. 2d 145, ¶ 46.

¶ 63. To discern legislative intent under the second prong of our methodology, we analyze the following four factors: (1) all applicable statutory language; (2) the legislative history and context of the statutes; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishments for the conduct. *Patterson,* 329 Wis. 2d 599, ¶ 16; *Davison,* 263 Wis. 2d 145, ¶ 50; *State v. Derango,* 2000 WI 89, ¶ 34, 236 Wis. 2d 721, 613 N.W.2d 833.

¶ 64. In this case, we agree with the circuit court that Counts 10 through 14 of the information are not multiplicitous. We conclude that the five offenses, while identical in law, are different in fact. We further con-

clude that Ziegler has failed to rebut the presumption that the legislature intended to permit cumulative punishments for the five offenses.

¶ 65. Ziegler was charged with and convicted of five counts of second-degree sexual assault of Nicole in violation of Wis. Stat. § 948.02(2). Section 948.02(2) provides that "[w]hoever has sexual contact or sexual intercourse with a person who has not attained the age of 16 years is guilty of a Class C felony." In Counts 10 and 11, respectively, the State alleged that Ziegler had sexual intercourse with Nicole by having Nicole perform oral sex on him and by digitally penetrating Nicole's vagina. In Counts 12 through 14, respectively, the State alleged that Ziegler had sexual contact with Nicole by touching her breasts, by having Nicole touch his penis with her hand, and by striking Nicole's buttocks.

¶ 66. There is no question that the five offenses are identical in law. Each of the five offenses was charged under Wis. Stat. § 948.02(2). Consequently, applying the "elements-only" test, all five offenses require proof of the same facts, or elements.[12] *See Blockburger,* 284 U.S. at 304.

¶ 67. It does not follow, however, that the five offenses are necessarily identical in fact. *See Eisch,* 96 Wis. 2d at 30–31. We conclude that the five offenses, while identical in law, are different in fact. That is, the five acts allegedly committed are sufficiently different in fact to demonstrate that Ziegler committed five separate crimes. *See id.* at 31.

---

[12] The crime of second-degree sexual assault of a child has two elements: (1) the defendant had sexual contact or sexual intercourse with the victim, and (2) the victim was under the age of 16 years at the time of the alleged sexual contact or sexual intercourse. *See* Wis JI—Criminal 2104.

¶ 68. In *Eisch*, this court concluded that the defendant's four alleged acts of forcible and nonconsensual sexual intercourse constituted four separately chargeable offenses, even though the four acts involved the same victim and took place at the same location over a period of time that did not exceed two and one-half hours. *Id.* at 27. In that case, the State alleged that on May 18, 1978, the defendant forcibly removed the victim's clothing and inserted his penis into her vagina several times while striking her and choking her. *Id.* The State further alleged that the defendant inserted his penis into the victim's anus, forced a beer bottle into her vagina, and forced his penis into her mouth. *Id.* The record revealed that the alleged attack was continuous and took place between 1:00 a.m. and 3:30 a.m. *Id.* at 28.

¶ 69. The State charged the defendant with four counts of second-degree sexual assault by use of force in violation of Wis. Stat. § 940.225(2)(a) (1977–78). *Id.* The four counts comprised the following four acts: (1) genital intercourse, (2) anal intercourse, (3) fellatio, and (4) insertion of a beer bottle into the victim's genitals. *Id.*

¶ 70. The defendant moved to dismiss all but one of the four counts, arguing that the counts were multiplicitous because each of the four alleged acts arose out of the same incident. *Id.* at 29. The circuit court agreed and dismissed three of the four counts. *Id.* The court of appeals affirmed. *Id.* at 26–27.

¶ 71. On appeal, this court reversed and remanded the cause to the circuit court. *Id.* at 42. The court concluded that the four alleged offenses, although identical in law, were sufficiently different in fact to demonstrate that four separate crimes had been committed. *Id.* at 31. The court reasoned that each of the

alleged acts required a separate volitional act; involved a different method of bodily intrusion; required a separate application of force and threat; and resulted in a new and different humiliation, danger, and pain. *Id.* at 37.

¶ 72. By contrast, in *Hirsch,* the court of appeals affirmed the dismissal of three counts of first-degree sexual assault of a child on the grounds that the counts were multiplicitous. 140 Wis. 2d at 470. In that case, stemming from allegations that the defendant touched the five-year-old victim by moving his hand from her vagina, to her anus, and back again to her vagina, *id.* at 474, the State charged the defendant with three separate counts of first-degree sexual assault of a child in violation of Wis. Stat. § 940.225(1)(d) (1987–88), *id.* at 470. The court of appeals concluded that the three alleged acts were not sufficiently different in fact to be properly denominated separate crimes. *Id.* at 474. The court reasoned that the alleged acts were "extremely similar in nature and character," each involving the defendant's hand and two of the three involving the victim's vaginal area. *Id.* In addition, because the entire episode "took no more than a few minutes," the court of appeals was not convinced that the defendant had sufficient time for reflection in between the alleged acts. *Id.* at 475.

¶ 73. Comparing *Eisch* and *Hirsch* to the instant case, it is readily apparent that the five alleged acts comprised in Counts 10 through 14 of the information are much more akin to those acts at issue in *Eisch.* The five alleged acts—fellatio, digital penetration of Nicole's vagina, the touching of Nicole's breasts, the touching of Ziegler's penis, and the striking of Nicole's buttocks—are significantly different in nature, involving different methods of intrusion and contact and different areas of Ziegler and Nicole's bodies. While the five alleged acts took place in the course of the same evening, each act is

distinct and hence "required a new volitional departure" in Ziegler's course of conduct. *See Eisch,* 96 Wis. 2d at 36; *see also Multaler,* 252 Wis. 2d 54, ¶¶ 56–57. Accordingly, we conclude that the five alleged acts are sufficiently different in fact to demonstrate that Ziegler committed five separate crimes.

¶ 74. Because we conclude that the five offenses, while identical in law, are different in fact, we presume that the legislature intended to permit cumulative punishments, *see Patterson,* 329 Wis. 2d 599, ¶ 15; *Davison,* 263 Wis. 2d 145, ¶ 44, and Ziegler bears the burden of demonstrating otherwise, *see Patterson,* 329 Wis. 2d 599, ¶ 17; *Davison,* 263 Wis. 2d 145, ¶ 45. In his briefing, Ziegler makes no effort to demonstrate that cumulative punishments for the five offenses are contrary to legislative intent. Indeed, our independent review of the relevant statutory language and legislative history, the nature of the proscribed conduct, and the appropriateness of multiple punishments supports the presumption otherwise.

¶ 75. Wisconsin Stat. § 948.02(2) prohibits "sexual contact or sexual intercourse with a person who has not attained the age of 16 years . . . ." Thus, by its plain language, § 948.02(2) proscribes two forms of conduct: "sexual contact" with a child under the age of 16 and "sexual intercourse" with a child under the age of 16. The terms "sexual contact" and "sexual intercourse" are specially-defined for purposes of Chapter 948. Wisconsin Stat. § 948.01(5)(a) defines "sexual contact," in relevant part, as "intentional touching . . . for the purpose of sexually degrading or sexually humiliating the complainant or sexually arousing or gratifying the defendant," including both (1) intentional touching of the complainant's intimate parts by the defendant and

291

(2) intentional touching of the defendant's intimate parts by the complainant upon the defendant's instruction. That the legislature separately enumerated touching by the defendant and touching by the complainant indicates that the legislature considered each act—here, the touching of Nicole's breasts by Ziegler, the touching of Ziegler's penis by Nicole, and the striking of Nicole's buttocks by Ziegler—to be distinct and chargeable in its own right. Likewise, § 948.01(6) defines "sexual intercourse," in relevant part, to include "vulvar penetration as well as cunnilingus, fellatio or anal intercourse . . . ," again indicating that the legislature intended each act—here, fellatio and Ziegler's digital penetration of Nicole's vagina—to give rise to a separate, substantive crime.

¶ 76. The legislature has separately defined the terms "sexual contact" and "sexual intercourse" since the inception of Wis. Stat. ch. 948. Pursuant to 1987 Wis. Act 332, § 55, the legislature created Chapter 948 in order to specially organize crimes against children, offenses which were previously located throughout the general Criminal Code. *See* Drafting File for 1987 Wis. Act 332, *Information Memorandum 88–2: New Law Relating to Crimes Against Children* 1 (Apr. 29, 1988), Legislative Reference Bureau, Madison, Wis. The Legislative Council's 1986–87 Special Committee on Crimes Against Children, which developed Act 332, concluded that a separate chapter accomplishes the objective of "[e]mphasizing the seriousness of offenses against the most vulnerable crime victims in our society." *Id.* at 4. In this case, permitting cumulative punishments for Ziegler's five offenses perpetrated against Nicole furthers the legislature's express objective of emphasizing the seriousness of crimes against children.

¶ 77. Relatedly, the nature of the conduct proscribed by Wis. Stat. § 948.02(2) renders cumulative punishments especially appropriate. Each act of sexual contact and sexual intercourse, while proscribed by the same statute and perpetrated against the same victim on the same evening, resulted in a new and different humiliation and danger on the part of a child. Indeed, it is hard to imagine a series of acts that is more appropriately subject to cumulative punishments.

## C

¶ 78. Ziegler also argues that the circuit court's admission at trial of his mug shot deprived him of his right to a fair trial. In particular, relying on *United States v. Harrington,* 490 F.2d 487 (2d Cir. 1973), Ziegler asserts that he is entitled to a new trial on the grounds that the admission of his mug shot impermissibly suggested to the jury that he had a prior criminal record, despite the fact that Ziegler exercised his right not to testify in his own defense. In addition, Ziegler contends that Counts 7 and 8, those alleging crimes against Samantha, ought to be dismissed on the grounds that the mug shot constituted an impermissible "showup"[13] in violation of *State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582. We address these arguments in turn, concluding that neither has merit.

¶ 79. If, at trial, the defendant exercises his right not to testify in his own defense and is not otherwise responsible for causing the jury to be informed about

[13] A "showup" is "[a] pretrial identification procedure in which a suspect is confronted with a witness to or the victim of a crime." *Black's Law Dictionary* 1385. "Unlike a lineup, a showup is a one-on-one confrontation." *Id.*

293

his previous convictions, then the defendant "is entitled to have the existence of any prior criminal record concealed from the jury." *Harrington,* 490 F.2d at 490. In such circumstances, the Second Circuit Court of Appeals has held that the introduction at trial of the defendant's mug shot "may well be equivalent to the introduction of direct evidence of a prior criminal conviction" in violation of the defendant's right to a fair trial. *Id.* Accordingly, the *Harrington* court determined that in the event that the defendant does not testify at trial, the introduction of the defendant's mug shot constitutes reversible error unless the following three prerequisites are satisfied: (1) the Government must have a "demonstrable need" to introduce the mug shot; (2) the mug shot, "if shown to the jury, must not imply that the defendant has a prior criminal record"; and (3) the manner in which the mug shot is introduced must "not draw particular attention to the source or implications" of the mug shot. *Id.* at 494.

¶ 80. Assuming *arguendo* that *Harrington* applies to the instant case, we conclude that all three of the foregoing prerequisites are satisfied. First, the State had a demonstrable need to introduce Ziegler's mug shot. Samantha, the alleged victim in Counts 7 and 8 and the only witness to the underlying acts, recognized Ziegler by name but failed to identify him in court. As the record reflects, Ziegler lost a considerable amount of weight while awaiting trial. The State therefore needed to introduce Ziegler's mug shot in order for Samantha to identify Ziegler and thereby provide a foundation for her crucial testimony. Second, there is no indication in the record that the jury was ever shown Ziegler's mug shot. In fact, the circuit court expressly stated that it had no intention of publishing the mug

shot to the jury. Third and finally, the manner in which the State introduced Ziegler's mug shot specifically dispelled any implication that the photograph concerned Ziegler's prior criminal record. Defense counsel's objection to the mug shot was discussed outside of the jury's presence, and Detective Fisher, testifying for the State, explicitly identified the mug shot as Ziegler's booking photo from his January 28, 2008, arrest for the underlying charges.

¶ 81. *Dubose* is likewise inapplicable to the instant case. A showup, by definition, is an out-of-court pre-trial identification. *See Dubose,* 285 Wis. 2d 143, ¶ 1 n.1; *Black's Law Dictionary* 1385 (7th ed. 1999). A showup implicates a defendant's right to due process on the grounds that the practice of showing a single suspect to an excited or stressed eyewitness or victim for the purpose of identification gives rise to the likelihood of an irreparable misidentification. *See Dubose,* 285 Wis. 2d 143, ¶¶ 18, 22. Accordingly, in *Dubose,* this court held that "evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary." *Id.,* ¶ 33. A showup is deemed necessary if "the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array." *Id.*

¶ 82. In the instant case, Samantha's identification of Ziegler through his mug shot did not constitute a showup. The identification occurred in court, during trial. By that time, Ziegler was no longer only a suspect but rather a charged defendant. What is more, there is no indication that misidentification was an issue at

295

Ziegler's trial, as every other alleged victim identified Ziegler, in court, as the perpetrator. We therefore see no reason to apply *Dubose* to the instant case, and Ziegler points us to none.

## D

¶ 83. Finally, Ziegler maintains that he is entitled to a new trial on the grounds that the circuit court erroneously exercised its discretion in ordering him to wear a stun belt at trial. Specifically, citing *State v. Champlain,* 2008 WI App 5, 307 Wis. 2d 232, 744 N.W.2d 889, Ziegler asserts that the circuit court committed reversible error by failing to inquire into the necessity of the device. We disagree.

¶ 84. Generally, a criminal defendant should not be restrained during trial. *State v. Miller,* 2011 WI App 34, ¶ 4, 331 Wis. 2d 732, 797 N.W.2d 528. Restraints may jeopardize a criminal defendant's right to a fair and impartial trial by "psychologically engender[ing] prejudice in the minds of jurors when they view 'a man presumed to be innocent in the chains of the convicted.' " *Grinder,* 190 Wis. 2d at 551–52 (quoting *State v. Cassel,* 48 Wis. 2d 619, 624, 180 N.W.2d 607 (1970)). At the same time, the general rule against restraining a criminal defendant may give way when necessary to protect the public. *Id.* at 552; *Miller,* 331 Wis. 2d 732, ¶ 5. Accordingly, in the exercise of its discretion, a circuit court may require restraints when "they are 'necessary to maintain order, decorum, and safety in the courtroom.' " *Grinder,* 190 Wis. 2d at 552 (quoting *Flowers v. State,* 43 Wis. 2d 352, 362, 168 N.W.2d 843 (1969)).

¶ 85. In *Champlain,* referenced by Ziegler, the court of appeals concluded that a circuit court has the "affirmative, sua sponte duty" to inquire into the neces-

sity of a restraint once the circuit court becomes aware that the defendant is wearing one at trial. 307 Wis. 2d 232, ¶ 32. At the same time, in *Miller*, a more recent case not cited by Ziegler, the court of appeals explicitly clarified that a circuit court's duty under *Champlain* "does not extend to situations in which the jury cannot see the defendant's restraints." *Miller*, 331 Wis. 2d 732, ¶ 8; *see also id.*, ¶ 11 ("[A] trial court has no sua sponte duty to inquire into the necessity of hidden restraints.").

■■■

¶ 86. In the instant case, in order to prevent any "problems," the circuit court ordered Ziegler to wear a stun belt at trial. On the first day of trial, the circuit court expressly found that Ziegler was wearing "no visible restraints." That finding is supported by several photographs in the record, taken before jury selection. The stun belt, according to the circuit court, was located on Ziegler's leg, assumedly underneath his "dark trousers." While Ziegler, in his briefing before this court, makes much of the fact that the circuit court expressed only that it "believe[d]" the stun belt was on Ziegler's leg, Ziegler offers no evidence that the stun belt was located anywhere else or was otherwise visible. Indeed, that the circuit court was not positive as to the location of the stun belt actually supports the court's finding that Ziegler was not wearing any visible restraints. Moreover, once Ziegler was wearing the stun belt, neither Ziegler nor his counsel expressed any concerns relating to the restraint. In fact, their only complaint about Ziegler's appearance was the bagginess of his borrowed clothing. It goes without saying that Ziegler's loose pants made it even less likely that the stun belt was visible underneath. Because the circuit court's finding that Ziegler was wearing "no visible restraints" is supported by the record, we conclude that *Champlain* has no application to this case.

## V. CONCLUSION

¶ 87. First, in answer to the certified question, we conclude that the court of appeals' interpretation of the phrase "withholds a child for more than 12 hours from the child's parents" in Wis. Stat. § 948.31(2), as set forth in *Bowden,* is contrary to the plain language of the statute. We therefore withdraw from *Bowden* any language that suggests that § 948.31(2) requires the State to prove that the defendant had the parents' "initial permission" to take the child. The remainder of *Bowden* retains its precedential value.[14]

¶ 88. Applying the appropriate interpretation of Wis. Stat. § 948.31(2) to the instant case, we determine that the evidence was sufficient to convict Ziegler of interference with child custody.

¶ 89. Second, we conclude that Counts 10 through 14 of the information, each charging Ziegler with second-degree sexual assault of the same child, are not multiplicitous. The five offenses, while identical in law, are different in fact. We further conclude that Ziegler has failed to rebut the presumption that the legislature intended to permit cumulative punishments for the five offenses.

¶ 90. Third, we determine that the circuit court's admission at trial of Ziegler's mug shot did not deprive Ziegler of his right to a fair trial.

¶ 91. Fourth and finally, we conclude that the circuit court appropriately exercised its discretion in ordering Ziegler to wear a stun belt at trial.

*By the Court.*—The judgment of the circuit court is affirmed.

---

[14] *See supra* note 3.

¶ 92. SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part and dissenting in part*). The defendant in the present case, 42 years of age, engaged in despicable conduct. He was convicted of 14 felony counts and was sentenced to 35 years in initial confinement and 20 years on extended supervision. Majority op., ¶ 33.

¶ 93. The defendant challenges his convictions on four grounds. I disagree with the defendant's position on three of his grounds. I therefore agree with the majority opinion that the defendant's convictions of 13 felony counts stand.

¶ 94. However, I disagree with the majority's interpretation of Wis. Stat. § 948.31(2), which affects one of the 14 convictions, namely the conviction for interference with child custody.

¶ 95. I dissent because the majority errs in its interpretation of Wis. Stat. § 948.31(2):

(1) The majority fails to apply basic, accepted rules of statutory interpretation. Although the majority asserts that "we must construe statutory language reasonably" and that "[a]n unreasonable interpretation is one that yields absurd results . . . or contravenes the statute's manifest purpose," majority op., ¶ 43, the majority does not analyze or apply this rule of interpretation in the present case.

(2) The majority's interpretation of Wis. Stat. § 948.31(2) yields absurd results. I agree with the State that the majority's statutory interpretation is broad enough to criminalize innocent conduct. I am unpersuaded, however, by the State's argument that we may rely on prosecutorial discretion to ensure that the statute will be applied in a way that avoids criminalizing innocuous conduct.

(3) The majority fails to pay proper heed to precedent, namely *State v. Bowden,* 2007 WI App 234, 306 Wis. 2d 393, 742 N.W.2d 332, and fails to apply accepted approaches to statutory interpretation.

(4) The majority's interpretation untethers the statute from its intended purpose and scope, as described in the Legislative Council Notes to Wis. Stat. § 948.31(2). The Legislature adopted the Notes as part of 1987 Wis. Act 332.

# I

¶ 96. The majority mechanically examines the text of the statute and fails to apply basic, accepted rules of statutory interpretation.

¶ 97. The defendant was charged with violating Wis. Stat. § 948.31(2).[1] More specifically, he was charged with one of the three ways of violating the statute, namely, withholding a child for more than 12 hours from the child's parents.

¶ 98. A prior court of appeals decision, *State v. Bowden,* 2007 WI App 234, 306 Wis. 2d 393, 742 N.W.2d 332, analyzed Wis. Stat. § 948.31(2) and declared that "[t]he withholding method addresses a situation where the person who takes the child has some initial permission to do so." *Id.,* ¶ 18.

---

[1] Wisconsin Stat. § 948.31(2) provides:

*Whoever* causes a child to leave, takes a child away or *withholds a child for more than 12 hours from the child's parents* or, in the case of a nonmarital child whose parents do not subsequently intermarry under s. 767.803, from the child's mother or, if he has been granted legal custody, the child's father, without the consent of the parents, the mother or the father with legal custody, *is guilty of a Class I felony.* This subsection is not applicable if legal custody has been granted by court order to the person taking or withholding the child. (Emphases added.)

¶ 99. In its certification, the court of appeals framed the issue as "whether *Bowden*'s interpretation is contrary to the plain language of the statute." The court of appeals also opined that "*Bowden*'s interpretation seems to add language to the statute (and an element to the crime), which is something we may not do."

¶ 100. The majority wholeheartedly accepts the court of appeals' one-dimensional framing of the issue. The majority concludes that the "initial permission" requirement created by *Bowden* "is contrary to the plain language of the statute" and therefore that the conviction may stand. Majority op., ¶¶ 7–8, 51–55.

¶ 101. Relying solely on a rote application of the "plain language" rule of interpretation, the majority is of course correct that the statute makes no reference to "initial permission." Majority op., ¶ 53.

¶ 102. The majority's statutory interpretation is, however, oversimplified. This court is expected to do more than robotically read the words of a statute. As the majority itself explains, this court "must construe statutory language reasonably," and "[a]n unreasonable interpretation is one that yields absurd results . . . or contravenes the statute's manifest purpose." Majority op., ¶ 43. Yet the majority does not even pause to consider whether its interpretation of the statute is reasonable.

## II

¶ 103. The majority's interpretation of Wis. Stat. § 948.31(2) yields absurd results. I agree with the State that the majority's interpretation of the statute is so broad that it encompasses innocuous, innocent behavior that would not be considered felonious.

¶ 104. According to the majority, the elements of the felony are "(1) on the date of the alleged offense, the

301

child was under the age of 18 years; (2) the defendant withheld the child for more than 12 hours from the child's parents; and (3) the child's parents did not consent." Majority op., ¶ 52. The majority explains that the second element is satisfied "if the defendant restrains the child or otherwise refrains from giving the child to the child's parents." Majority op., ¶ 53.

¶ 105. Under the majority's interpretation, there is no intent or knowledge required on the part of the defendant, which makes the potential breadth of the majority's interpretation staggering.

¶ 106. For example, under the majority's interpretation, if a child under the age of 18 (without permission from his or her parents) goes over to a friend's house and stays at the friend's house for over 12 hours, the friend's parent falls within the plain language of the statute and could be charged with a felony. Element (1) is satisfied because the child was under 18; element (2) is satisfied because the parent of the friend "refrain[ed] from giving the child to the child's parents" for 12 hours; and element (3) is satisfied because the child's parents did not consent.

¶ 107. In fact, a child who invites another child over for a sleepover could be charged under the statute under the majority's interpretation.

¶ 108. At oral argument, the State forthrightly acknowledged the potential breadth of the interpretation it sought. The State accepts that its interpretation of the statute encompasses not only culpable conduct that one would ordinarily consider criminal, but also innocent conduct. The State's proposed solution to this dilemma is to rely on prosecutorial discretion to ensure that the statute is applied only in appropriate situations.

¶ 109. I recognize the necessity and value of prosecutorial discretion in our system, but the majority opinion's statutory interpretation takes prosecutorial discretion too far and allows prosecutorial discretion to invade the legislative role of deciding what conduct constitutes a crime.

¶ 110. I conclude that the majority's interpretation of Wis. Stat. § 948.31(2) is unacceptable because it yields absurd results.

### III

¶ 111. The majority fails to pay proper heed to precedent, namely the *Bowden* case, and fails to adhere to accepted approaches to statutory interpretation.

¶ 112. The "initial permission" requirement adopted in *Bowden* that the State now seeks to void was actually adopted at the State's suggestion in *Bowden*. In the State's brief in *Bowden,* the State argued as follows:

> "Withholds" suggests a situation where a defendant has permission to take the child for a set period of time but then fails to return the child to the parents, and keeps the child for more than twelve hours without the parents' consent. It addresses a situation where the defendant has permission of the parents to have physical possession of the child in the first place . . . .[2]

---

[2] *State v. Bowden,* 2007 WI App 234, 306 Wis. 2d 393, 742 N.W.2d 332, Brief of Plaintiff-Respondent at 6.

The State asserts in its brief before the court in the present case that "the State does not believe that its argument in *Bowden* should be interpreted as stating that the withholding method can only be applied where the defendant has initial permission to have the child, but instead speaks to what normally would be the case." Brief of Plaintiff-Respondent at 13–14 n.2.

¶ 113. *Bowden* has been the law since it was decided in 2007.

¶ 114. Principles of stare decisis ("to stand by that which has been decided") apply to published court of appeals decisions, and stare decisis commands that this court adhere to a prior court of appeals decision "unless a compelling reason exists to overrule it."[3] Thus, "[w]hen a party asks this court to overturn a prior interpretation of a statute, it is his 'burden . . . to show not only that [the decision] was mistaken but also that it was objectively wrong . . . .' "[4]

¶ 115. Although the "initial permission" requirement does not appear in the text of the statute, the requirement is not "objectively wrong." Interpreting the statute to include this requirement is one way to prevent the absurd results created by the majority opinion.

¶ 116. The "initial permission" requirement in *Bowden* is a step closer to a reasonable interpretation than the interpretation the majority adopts today, although *Bowden* is not necessarily the ideal way to place a reasonable limit on the scope of Wis. Stat. § 948.31(2). Were the court's sole options either retaining *Bowden*'s "initial permission" requirement or abandoning it and robotically applying the text of the statute, the former would have been the more reasonable choice.[5]

---

[3] *See Wenke v. Gehl Co.,* 2004 WI 103, ¶ 21, 274 Wis. 2d 220, 682 N.W.2d 405 (citations omitted).

[4] *Progressive N. Ins. Co. v. Romanshek,* 2005 WI 67, ¶ 45, 281 Wis. 2d 300, 697 N.W.2d 417 (quoting *Wenke,* 274 Wis. 2d 220, ¶ 21).

[5] In reality, the court has other options. For one, the court could read an intent requirement into the statute.

Another important consideration left unaddressed by the parties and the majority is whether the present case should be

¶ 117. The State, which argued in favor of the "initial permission" requirement in *Bowden,* seemingly understands that the requirement is a reasonable interpretation. The State asserts in its brief before this court that "[w]hile the withholding method of interfering with child custody does not require that the defendant have initial permission to have the child, *this will undoubtedly be the case in most applications of the statute.*"[6] (Emphasis added.)

¶ 118. Furthermore, although the fact that the legislature has not overturned a court's interpretation of a statute is far from determinative of legislative intent,[7] legislative acquiescence in a court decision is a "presumption to aid in statutory construction."[8] In the present case, the legislature's failure to amend the statute in response to the court of appeals' 2007 *Bowden* decision " 'evinces legislative approval of the interpretation.' "[9]

¶ 119. As noted above, the court must have a compelling reason to overrule a prior court's interpretation of a statute. No compelling reason exists to overturn *Bowden,* particularly when *Bowden* is not being replaced by a reasonable alternative.

¶ 120. In sum, giving short shrift to precedent and to accepted approaches to statutory interpretation,

governed by the *Bowden* interpretation because it was the law at the time of the defendant's offense.

[6] Brief of Plaintiff-Respondent at 13 n.2.

[7] *See, e.g., Wenke,* 274 Wis. 2d 220, ¶¶ 32–37.

[8] *Id.,* ¶ 35.

[9] *Id.,* ¶ 33 (quoting *State v. Eichman,* 155 Wis. 2d 552, 556, 456 N.W.2d 143 (1990)). For additional discussion of legislative inaction as an interpretive tool, see *Milwaukee Journal Sentinel v. City of Milwaukee,* 2012 WI 65, ¶¶ 43, 53, 341 Wis. 2d 607, 815 N.W.2d 367.

the majority cursorily concludes that the "initial permission" requirement adopted in *Bowden* does not appear in the statute, that the "initial permission" requirement must be eliminated, and that no other analysis of statutory interpretation is required. The majority does not analyze whether its statutory interpretation is reasonable and does not explore more reasonable alternative interpretations. I therefore conclude that the majority opinion does not demonstrate an acceptable approach to precedent or to principles of statutory interpretation.

## IV

¶ 121. The majority's interpretation untethers the statute from its intended purpose and scope.

¶ 122. The language and statutory history of Wis. Stat. § 948.31 make clear that the legislature did not intend Wis. Stat. § 948.31 to apply to situations like the present case, in which the child is with a person who is a stranger to the family. Rather, Wis. Stat. § 948.31 applies to situations in which one of the parents or guardians interferes with the lawful custody of another parent or guardian.

¶ 123. Although Wis. Stat. § 948.31(2) begins with the all-inclusive word "[w]hoever," the title to Wis. Stat. § 948.31 suggests that the statute is primarily meant to address custody disputes as opposed to abductions by strangers. The title of Wis. Stat. § 948.31 is "Interference with custody by parent or others." The focus on "parent" is indicative of the statute's intended scope.

¶ 124. It is also noteworthy that Wis. Stat. § 948.30, the neighboring statute, has the title "Abduction of *another's* child; constructive custody" (emphasis added).

¶ 125. Based on the titles (which the court sometimes considers useful), it appears that the defendant in

the present case fits more neatly within Wis. Stat. § 948.30 than Wis. Stat. § 948.31.[10]

¶ 126. Further, the affirmative defenses set forth in Wis. Stat. § 948.31(4) indicate that the legislature intended prosecutions under Wis. Stat. § 948.31 to focus on parents and guardians, not strangers. There are three specific affirmative defenses. The first two protect the defendant if the actions were "taken by a parent" in certain situations. Wis. Stat. § 948.31(4)(a)1.-2. The third protects the defendant if the actions were "consented to by the *other parent.*" Wis. Stat. § 948.31(4)(a)3. (emphasis added). These affirmative defenses strongly indicate that the legislature expected the person being prosecuted under Wis. Stat. § 948.31 to be a parent of the child.[11]

¶ 127. Finally, 1987 Wis. Act 332, which created Wis. Stat. § 948.31 and Wis. Stat. § 948.30, confirms that the legislature did not intend Wis. Stat. § 948.31 to be invoked by prosecutors in cases like the present case. 1987 Wis. Act 332 includes explanatory Notes that were drafted by the Legislative Council. These Notes appear in the text of Act 332 and were adopted by the legislature. Unlike drafting records or analysis by the Legisla-

---

[10] Wisconsin Stat. § 990.001(6) provides that "[t]he titles to subchapters, sections, subsections, paragraphs and subdivisions of the statutes and history notes are not part of the statutes." Nonetheless, "courts often examine titles and history notes because they provide valuable clues to the meaning of statutory text." *Madison Metro. Sch. Dist. v. Circuit Court for Dane Cnty.,* 2011 WI 72, ¶ 65 n.12, 336 Wis. 2d 95, 800 N.W.2d 442.

[11] Cross-references to Wis. Stat. § 948.31 elsewhere in the Wisconsin Statutes support a similar conclusion. For example, Wis. Stat. § 49.22, which addresses child support and other topics, refers to "persons who are alleged to have taken *their child* in violation of s. 948.31" (emphasis added).

tive Reference Bureau, these Notes are part of the text of Act 332. They should be examined in deciding the plain meaning of Wis. Stat. § 948.31 because they were adopted by the legislature.

¶ 128. Two particularly important points can be gleaned from these Notes.

¶ 129. First, a Note explains the intended scope of Wis. Stat. § 948.30 and Wis. Stat. § 948.31. The Note provides that the amendment to the child abduction statute (Wis. Stat. § 948.30) is meant to "[s]pecify that the prohibition applies only to a person who abducts a child who is not his or her own child by birth or adoption."[12] Crucially, the Note goes on to explain that "[t]here are *other statutory provisions which more appropriately deal with a parent who takes or conceals his or her child* from the other parent or other legal custodian of the child [*see s. 948.31* in this bill, relating to custody interference by parents and others]."[13] Thus, the legislature explicitly explained that Wis. Stat. § 948.31 is intended to address parents who take or conceal their children, not strangers.

¶ 130. Second, a Note explains the origins of Wis. Stat. § 948.31, the provision at issue in the present case, and how it differs from the statutes that were combined to create it.

¶ 131. The Note explains that Wis. Stat. § 948.31 was created by combining Wis. Stat. § 946.71 (1985–86) ("Interference with custody of child") and Wis. Stat. § 946.715 (1985–86) ("Interference by parent with parental rights of other parent").

¶ 132. Wisconsin Stat. § 946.71 (1985–86) became Wis. Stat. § 948.31(2). Interestingly, the earlier statute

---

[12] 1987 Wis. Act 332, § 55.

[13] 1987 Wis. Act 332, § 55 (emphases added).

included mens rea. It provided that "whoever *intentionally* does any of the following is guilty of a Class E felony: . . . (4) Entices away, takes away or withholds for more than 12 hours any child under the age of 14 from the parents, or the child's mother in the case of a nonmarital child where parents do not subsequently intermarry under s. 767.60, without the consent of the parents or the mother . . ." (emphasis added).

¶ 133. The Note explains that the earlier statute was amended to make it applicable to children of any age, not just children under the age of 14.[14] The Note also explains several other ways in which Wis. Stat. § 948.31 differs from its predecessors, but there is no reference to the legislature's abandoning the requirement of intentional conduct. Had such a drastic change in the statute been intended, one would think it would be referenced along with the other changes in the explanatory Note.

¶ 134. In sum, there is sufficient evidence in the Legislative Council Notes adopted by the legislature indicating that the intended purpose and scope of Wis. Stat. § 948.31(2) is much narrower than the sprawling scope created by the majority's interpretation. The legislature did not intend Wis. Stat. § 948.31(2) to apply when the defendant is not a parent or legal guardian of the child or a person with permission. Additionally, it is not likely that the legislature intended Wis. Stat. § 948.31(2)—a serious felony—to operate without any mens rea requirement.

¶ 135. Because the majority's interpretation of the statute untethers it from its intended purpose and scope as illustrated in the Legislative Council Notes adopted as part of 1987 Wis. Act 332, and because the

_____
[14] 1987 Wis. Act 332, § 55.

majority's interpretation renders Wis. Stat. § 948.31(2) absurdly broad,[15] I conclude that the majority's interpretation is unreasonable.

* * * *

¶ 136. As I stated at the outset, 13 of the defendant's convictions stand. The defendant's assertions of error that I have not addressed are not persuasive. The defendant does not escape severe punishment for his abhorrent course of conduct. The court cannot, however, affirm the defendant's conviction for violating Wis. Stat. § 948.31(2) based on an unreasonable interpretation of the statute. Because the interpretation of Wis. Stat. § 948.31(2) adopted by the majority in the present case is unreasonable, the defendant's conviction for interference with child custody should be overturned.

¶ 137. For the reasons stated above, I dissent on this single issue only.

¶ 138. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence/dissent.

---

[15] *See supra* Part II.