PER CURIAM.
¶1 David A. Pierce appeals from a judgment entered on jury verdicts convicting him of five counts of theft by fraud and one count of theft by contractor. We reject his contentions that the evidence was not sufficient to convict him, that his trial counsel was ineffective, and that he merits a new trial in the interest of justice. We affirm the judgment of conviction and the order denying his motion for postconviction relief.[1]
¶2 Pierce was sole owner and operator of a small construction company, Pierce Builders, Inc. Pierce had done small jobs for Homeowners over the years.[2] In October 2006, Homeowners entered into a contract with Pierce to act as general contractor to construct their "dream home" on Geneva Lake in Walworth County. Eric Culp was hired as project coordinator. Homeowners told Pierce they wanted to keep the project at or below $ 5 million. Pierce estimated it would cost $ 4,997,680 and take eighteen months to complete.
¶3 Pierce gave Homeowners periodic software-generated project accounting sheets called "UDAs" that detailed cost estimates for each aspect of the work, such as masonry, landscaping, and cabinetry. As the project got underway, Homeowners and Pierce and/or Culp met regularly to discuss completed work, work still to be done, the status of bids, and the money needed to keep the project on track. The corresponding UDA then would be updated.
¶4 The UDA estimates began approaching the $ 5 million mark. Then, specialty windows integral to the design of the house ordered from a company in Philadelphia did not arrive in May 2007 as expected. Homeowner Husband and Pierce went to Philadelphia to meet with the dealer, to no avail.
¶5 Problems and costs escalated in 2008. In January, still windowless, Pierce traveled to Costa Rica where the windows were produced. A February UDA projected a total project cost exceeding $ 5.78 million, due to accounting changes, Pierce said. Pierce then had to return to Costa Rica because he learned the ordered windows had been pulled off the production line.
¶6 Pierce e-mailed Homeowners from Costa Rica that he would be opening his own window factory there in March, but would be "completely tapped within 2 months" if he did not "pull off some sale to fund this thing." He said he and his attorney were going to a dinner at the United States Embassy to meet with the "sub chairman of the U S commerce," and that he had been introduced to a contractor "to discuss the possibility of the use of our products for a contract he was awarded," the construction of Trump Towers in Panama. The e-mail ended with, "That would be one way to jump start a small window company."
¶7 In March, Pierce-still in Costa Rica-e-mailed Homeowners asking for a $ 500,000 loan and for their help in securing investors. He also said he had been charged with grand theft in his efforts to get their windows out of Costa Rica, but assured them that he was not in jail and that their windows were "safe."
¶8 In late April, Pierce met with Homeowners on site. He asked them to reimburse him for $ 285,000 in costs he incurred in Costa Rica. Some were for materials, transportation, and shipping of the windows. Homeowners balked at others: his legal fees, resort expenses incurred when he "needed a break," $ 1622 for beer, a $ 1000 watch, Armani suits, and others for remaining in Costa Rica after their windows had shipped. About to leave for Costa Rica once again, he asked to revisit the reimbursement matter when he returned in May.
¶9 In June, Pierce presented Homeowners with a UDA and a large number of "change orders." The change orders stated the original contract price to be over $ 5.78 million; the UDA increased the project's estimated cost to over $ 5.8 million. Pierce also gave them a tally of his debts, over $ 800,000, which he asked them to pay to keep him in business, although he conceded the list included expenses outside the scope of their project. They refused.
¶10 In July, Pierce gave Homeowners a payment schedule showing they already had paid more than $ 5.7 million but also asked them to cover his payroll for that week. Worried that the still-incomplete project might shut down, Homeowners gave him a check for $ 5290.01. Pierce returned to Costa Rica. The installed windows already leaking, Homeowners wired Pierce almost $ 30,000 to produce new windows.
¶11 That same month, Homeowners had their last contact with Pierce: a letter he had his father deliver to them. He wrote that they had been like his "adopted parents," that he had overestimated his company's ability to manage the scope of their project, that he was dissolving Pierce Builders as he was "officially broken," and that his Costa Rica window company could not produce their new windows, so he would wire the money back to them. Homeowners' attorney sent Pierce a letter stating that, by his letter, he had abandoned performance of the contract. Homeowners hired project manager Culp to finish the home.
¶12 Subcontractors began contacting Homeowners seeking payment for money Pierce still owed them. Homeowners retained accountant Michael Benes to try to track the money they paid to Pierce. Benes established that tens of thousands of dollars they had paid had not been turned over to the subs.
¶13 Homeowners contacted the police. In 2011, the State issued a warrant for Pierce's arrest. He returned to the United States in 2014 and, in February 2015, went to trial on five counts of theft by fraud and one count of theft by contractor, all in amounts over $ 10,000.
¶14 Homeowner Wife testified about the contract, the delays, the overruns, Pierce's abandonment of the project, and complaints from ten or fifteen subcontractors about not being fully paid. Five of them-representatives of Lyle's TV, which installed the central vacuum system and A/V equipment; Jeff's Masonry; Prate Roofing and Installations; Cabinet Studios, Inc.; and Genesis II Landscaping-testified that Pierce still owed each of them over $ 10,000.
¶15 Project coordinator Culp testified that, although regularly paid while Pierce was still on the project, Pierce had confided that he was "running low on funds." Culp also testified that Pierce had "padded" UDA estimates.
¶16 Both parties' accountants testified. Benes detailed how his investigation of the financial records led him to conclude that Homeowners had paid Pierce $ 5,769,498.44 for all completed work, but that Pierce did not pay the subs what he owed them. Pierce's accountant, Michael Roberts, testified that the cost of the project ranged from approximately $ 6,020,892.56 to $ 6,271,468.27, depending on how overhead costs were interpreted. Neither of Roberts' calculations included the cost of the windows due to the ongoing problems. Even using the lower calculation and without accounting for the windows, Roberts concluded that Homeowners still owed Pierce $ 251,394.12.
¶17 The jury found Pierce guilty on all six counts. Postconviction, he moved for relief alleging insufficient evidence, multiplicity in regard to the theft-by-fraud counts, ineffective assistance of trial counsel, and entitlement to a new trial in the interest of justice. The court denied those requests.[3] Pierce appeals.
I. Sufficiency of the Evidence
¶18 On a challenge to a jury verdict based on sufficiency of the evidence, we will not overturn the verdict "unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." State v. Poellinger , 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (citation omitted). "The credibility of the witnesses and the weight of the evidence is for the trier of fact." Id. at 504. Whether the evidence presented to a jury is sufficient to sustain its verdict is a question of law we review independent of the circuit court. State v. Booker , 2006 WI 79, ¶12, 292 Wis. 2d 43, 717 N.W.2d 676. "We must examine the record to find facts that support upholding the jury's decision to convict." State v. Hayes , 2004 WI 80, ¶57, 273 Wis. 2d 1, 681 N.W.2d 203. If any possibility exists that the evidence before the trier of fact allowed it to draw the appropriate inferences to find the requisite guilt, we may not overturn the verdict even if we believe it should not have found guilt based on that evidence. Poellinger , 153 Wis. 2d at 507.
A. Theft by Contractor
¶19 WISCONSIN STAT. § 779.02(5) makes a prime contractor a trustee of funds received from an owner. State v. Sobkowiak , 173 Wis. 2d 327, 333 n.2, 496 N.W.2d 620 (Ct. App. 1992). The statute imposes the trust on behalf of the subcontractors and suppliers of labor and materials. Capital City Sheet Metal, Inc. v. Voytovich , 217 Wis. 2d 683, 689, 578 N.W.2d 643 (Ct. App. 1998). "The prime contractor does not actually own the funds. His only interest is that of a trustee." Sobkowiak , 173 Wis. 2d at 334. The use of the money for any other purpose before all claims have been paid is theft by contractor punishable under WIS. STAT. § 943.20. Sec. 779.02(5).
¶20 "[T]he basis of liability for criminal theft by contractor is a violation of the trust fund provisions of WIS. STAT. § 779.02(5), plus the criminal intent required by WIS. STAT. § 943.20(1)(b)." Tri-Tech Corp. of Am. v. Americomp Servs., Inc. , 2002 WI 88, ¶24, 254 Wis. 2d 418, 646 N.W.2d 822. The elements of criminal theft by contractor are: (1) an agreement for the improvement of land, (2) the defendant received money from the owner under the agreement, (3) the defendant intentionally used any of the money for a purpose other than to pay claims due or to become due from the defendant for labor or materials used in the improvement before all claims were paid in full, (4) use of the money was without the owner's consent and contrary to the defendant's authority, and (5) the defendant knew use of the money was without consent and contrary to his authority. See WIS. JI- CRIMINAL 1443.
¶21 That the State proved the first two elements is not in dispute. Pierce contends that the State's case crumbles on the third element, such that the fourth and fifth elements become irrelevant. We disagree.
¶22 As the trial court noted at the postconviction motion hearing, the essence of the case was whether Homeowners did or did not pay enough to cover the cost of the project. Pierce's trial theory was they did not, such that he could not pay the subs. Pierce argues that the State did not prove that Homeowners paid enough to cover the subs' bills because Homeowners never saw the actual bills; they paid him by check without tying a specific payment to a specific sub or cost and without using a third party, such as a title company, to track the money; and it was not his fault that the costs for the windows they insisted on escalated so dramatically. Evidence that he had money troubles, he asserts, does not prove the requisite intent.
¶23 Pierce's efforts to shoot holes in the evidence are in vain. The evidence examined in the light most favorable to the verdict includes that Pierce: failed to satisfactorily explain the jump in cost from under $ 5 million to nearly $ 6 million; incurred and sought reimbursement for nonproject-related expenses; failed to ask Homeowners for amounts he now contends he needed to pay the subs; dodged many of the subs' attempts to contact him about getting paid; absented himself from the project to establish his own company in another country; abandoned Homeowners' project, basically admitting he had bitten off more than he could chew; and, according to Culp, padded UDAs unbeknownst to Homeowners and without paying the subs what he owed them.
¶24 Pierce also contends the State did not prove the actual cost of the project because all it produced were the UDAs, which are estimates, and only his accountant, Roberts, presented evidence of the actual cost. As the court observed, however, if Roberts' testimony that Homeowners underpaid was deemed the more credible evidence, it "would have carried the day" and the jury "would have come back with an acquittal." The guilty verdicts allowed the court to infer that the jury found more credible other testimony, such as Benes' scrutiny of UDAs, Pierce's QuickBooks files, invoices, cancelled checks, and bank statements.
B. Five Counts of Theft by Fraud
¶25 The theft-by-fraud statute, WIS. STAT. § 943.20(1)(d), makes it a crime to obtain "title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Id. "False representation" is not limited to an express promise. State v. Steffes , 2013 WI 53, ¶¶21-23, 347 Wis. 2d 683, 832 N.W.2d 101.
¶26 Theft by fraud requires the State to prove seven elements: (1) the victim owned the property at issue, (2) the defendant made a false representation to the owner, (3) the defendant knew the representation was false, (4) the defendant made the false representation with the intent to deceive and defraud the owner, (5) the defendant obtained title to the owner's property by false representation, (6) the owner was deceived by the representation, and (7) the owner was defrauded by the representation. WIS. JI- CRIMINAL 1453A.
¶27 The first element is satisfied on all five counts because Pierce took Homeowners' money. The State also proved the other elements. It presented evidence that showed that Pierce: overbilled Homeowners and underpaid the subs; acted with deliberate deceit by falsely leading the subs to believe that Homeowners had not paid him, causing the subs to seek payment directly from Homeowners, and falsely leading Homeowners to believe he was paying the subs; knew that his actions were deceitful because, soon after Homeowners refused to reimburse his total Costa Rica expenses, he presented them with a UDA that, without explanation, increased the estimated project cost to over $ 5.8 million; and defrauded Homeowners by continuing to take their money, despite knowing he was in money trouble and could not fulfill his obligations to them, and still did not use that money to pay the subs. The evidence was sufficient to establish that Pierce committed five counts of theft by fraud.
¶28 The jury's reasonable inferences from the evidence it found credible aligned with the State's theory that Homeowners paid what they believed they owed, that Pierce intentionally diverted some of the trust fund money to other uses, and that he intended to deceive and did defraud Homeowners through false representations of what they owed and whether the subs were paid. We must uphold the verdict.
II. Erroneously Admitted Evidence
¶29 Pierce contends the court erroneously admitted evidence that was hearsay, irrelevant, unfairly prejudicial, and confusing and was not harmless. Some evidence relates to a civil lawsuit Jeff Gehrke, owner of Jeff's Masonry, filed against Pierce seeking the amount still owed him, also naming Homeowners as defendants. Pierce objects to the admission of a letter Homeowners' attorney, as their agent, wrote to Gehrke's attorney (Exhibit 24) and the attachment to the letter (Exhibit 25) showing that they had paid Pierce for Jeff's Masonry's services; Gehrke's testimony that, on receipt of the letter, he dismissed Homeowners from the lawsuit; two balance sheets, Exhibits 23 and 38, Homeowners discovered in Pierce's desk drawer in the trailer he left on their lot after he abandoned the project, which included references to "actual costs," "excess cash from [Homeowners]," and "payments received"; and a chart Culp made itemizing Pierce's alleged padding of the UDAs.
¶30 A trial court's decisions regarding the admissibility of hearsay statements and determining the relevance of evidence involve the exercise of discretion; its decisions will not be reversed absent an erroneous exercise of discretion. State v. Weed , 2003 WI 85, ¶9, 263 Wis. 2d 434, 666 N.W.2d 485. Whether admission of a hearsay statement violates a defendant's right to confrontation presents a question of law that this court reviews de novo. Id. , ¶10. "Evidence erroneously admitted is subject to the harmless error rule." State v. Harris , 2008 WI 15, ¶85, 307 Wis. 2d 555, 745 N.W.2d 397. In other words, "there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue. A reasonable possibility of a different outcome is a possibility sufficient to 'undermine confidence in the outcome.' " Weborg v. Jenny , 2012 WI 67, ¶68, 341 Wis. 2d 668, 816 N.W.2d 191 (citations omitted).
¶31 Exhibits 24 and 25 were not inadmissible hearsay because they were not offered for their truth-i.e., the truth of where Homeowners' money actually went-but to show that Homeowners believed their payments were consistent with their contract with Pierce and that they believed they did not owe the subs additional money. Nor did the exhibits offend the Confrontation Clause because they were not testimonial or-simply because the letter was drafted by Homeowners' counsel-prepared in anticipation of litigation.
¶32 Gehrke's testimony that he pursued a civil action against Homeowners when Pierce told him that Homeowners were not up-to-date with their payments and dropped the action against them when he learned otherwise was relevant. That evidence tended to make more probable that Pierce's conduct-taking money from Homeowners and not paying the subs-was intentional and deceitful. See WIS. STAT. §§ 904.01, 943.20(1)(d).
¶33 We also disagree that Exhibits 23 and 38, the balance sheets found in Pierce's desk, were admitted without foundation. Both documents bore Pierce Builders' and Homeowners' names and contained details that corresponded to UDAs with which Homeowner Wife was familiar. Her testimony, limited to her discovery of the documents and reading some words and numbers on them, was generally within her personal knowledge. See WIS. STAT. § 906.02.
¶34 Those documents likewise were not irrelevant, hearsay, or speculative, as their contents and location in Pierce's desk permitted the reasonable inference that he created them and that they pertained to Homeowners' project. See WIS. STAT. § 908.01(4)(b). Finally, the court sustained Pierce's objection to the State's questioning of Homeowner Wife regarding the project's "actual cost" as outlined in Exhibit 23 on the basis that she was not qualified to interpret a document not her own, allowing the State to ask her only what the document said. We fail to see how the court erred.
¶35 Pierce also argues that the trial court should have sustained his objection to the admission of a worksheet Culp created entitled "Bids That Are Not Actual Costs." Culp testified that he was attempting to convey "dollar amounts [that] either never happened or were included in another sub's bid," essentially "[p]adding in the UDA." One of the columns was denominated "Amount Above True Cost." Pierce argues that the document lacked foundation and was hearsay. We disagree.
¶36 Project coordinator Culp testified that he was involved with inputting information regarding cost estimates, firm bids, and change orders into the computer to generate UDAs. He also testified that Pierce told him to show Homeowners only descriptions of services in the UDAs and the final dollar amounts so they would not see that some bids were padded or included elsewhere in the UDA. Culp had the personal knowledge to lay a proper foundation for the chart based on his own work. See WIS. STAT. § 906.02. His chart showing bids, costs, and money in and out was created from business records to which there was no objection, and he was available to testify about the chart and underlying records. The court did not erroneously exercise its discretion in overruling Pierce's objections on foundation and hearsay grounds.
¶37 Finally, Pierce argues that Culp's chart did not demonstrate padding because Roberts testified that Pierce Builders itself was part of the bidding process and "the general contractor on a cost[-]plus contract doing the actual work for the price of the lowest bid ... is not padding, it's business." Whether Culp's chart reflected common business practices or padding was the jury's call. Admission of any of these pieces of evidence does not undermine our confidence in the outcome.
III. Ineffective Assistance of Counsel
¶38 Pierce next asserts that trial counsel was ineffective in numerous ways. He contends counsel: (1) failed to challenge the theft-by-fraud counts as multiplicitous, (2) failed to "fully object" to evidence of Homeowners' dismissal from Gehrke's civil lawsuit, (3) elicited hearsay evidence from the owner of Cabinet Studio, (4) failed to object to testimony from Benes, (5) failed to "fully object" to documents Homeowner Wife found in Pierce's trailer, and (6) failed to seek to rebut Homeowner Wife's claim that she could not participate in arbitration. None of his claims are persuasive.
¶39 Whether a defendant has been denied the right to effective assistance of counsel presents a mixed question of law and fact. State v. Trawitzki , 2001 WI 77, ¶19, 244 Wis. 2d 523, 628 N.W.2d 801. The trial court's findings of historical fact will not be disturbed unless they are clearly erroneous. Id. The ultimate determinations based upon those findings of whether counsel's performance was constitutionally deficient and prejudicial are questions of law subject to our independent review. Id.
¶40 The defendant bears the burden of proving both that counsel's performance was deficient and that such performance prejudiced the defense. See Strickland v. Washington , 466 U.S. 668, 687 (1984) ; State v. Johnson , 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). "Counsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." State v. Thiel , 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. The defendant must overcome a strong presumption that counsel acted reasonably within professional norms. Johnson , 153 Wis. 2d at 127.
¶41 Prejudice is proved when the defendant affirmatively shows that counsel's errors were so serious that the defendant was deprived of a fair trial and reliable outcome. Strickland , 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
A. Multiplicity
¶42 "Multiplicity arises where the defendant is charged in more than one count for a single offense." State v. Rabe , 96 Wis. 2d 48, 61, 291 N.W.2d 809 (1980). The Double Jeopardy Clauses of our state and federal constitutions prohibit multiple punishments for the same offense. State v. Ziegler , 2012 WI 73, ¶59, 342 Wis. 2d 256, 816 N.W.2d 238.
¶43 To determine if charges are multiplicitous, we first assess whether the charged offenses are identical in law and fact. Trawitzki , 244 Wis. 2d 523, ¶21. If so, they are multiplicitous. Id. If not identical in law and fact, we ask if the legislature intended multiple prosecutions for the charged offenses. Id. If we conclude that the legislature intended only a single charge for the offenses, the charged offenses still are multiplicitous. Id.
¶44 Here, the State charged Pierce with five counts of theft by fraud. In each count, the State alleged that Pierce took money from Homeowner Wife for materials or labor by deceiving her "with a false representation which he knew to be false, made with intent to defraud" her. Each count alleged that the money Pierce took should have gone to a particular subcontractor but did not. Each count, therefore, alleged a different fact-a different subcontractor-and the State had to prove that Homeowner Wife was deceived into believing that her money was going to five different subcontractors when it was not. The State proved through Benes that Homeowners paid Pierce over $ 86,000 for Jeff's Masonry; over $ 54,000 for Lyle's TV and Appliance; over $ 39,000 for Cabinet Studio; over $ 60,000 for Prate Installations; and over $ 92,000 for Genesis II Landscaping but that Pierce did not pay the subs those amounts.
¶45 As these counts are not identical in fact, they are not multiplicitous in that regard. Pierce makes no claim that, even if the charges are not the same in fact, the legislature intended only a single charge and punishment. As only the first part of the multiplicity test implicates the constitutional double jeopardy provisions, id. , we address his multiplicity argument no further.
B. Failure to "Fully Object" (Points 2 and 5)
¶46 We reject these assertions out of hand. Counsel did object. We have concluded that the evidence was properly admitted. Pierce does not persuade us that objecting on other grounds would have succeeded. Counsel's performance is not deficient for not objecting to a meritless issue. See State v. Wheat , 2002 WI App 153, ¶14, 256 Wis. 2d 270, 647 N.W.2d 441.
C. Failure to Object to and Eliciting of Hearsay Evidence
¶47 Pierce argues that counsel should have objected to testimony from Mark Gunderson and Thomas Erger, the owners of Genesis II Landscaping and Cabinet Studios, respectively, that Homeowners convinced them either verbally or through "paperwork" that Homeowners had paid Pierce in full for the subs' bills. Pierce complains that the testimony lacked foundation, was hearsay, and was "incredibly prejudicial" because it bolstered Homeowner Wife's credibility.
¶48 Even if counsel had-or should have-objected to Gunderson's or Erger's testimony, Pierce has not shown that the result of the trial would have been any different. The jury heard over and again that Homeowners paid what they believed and what Pierce said they owed, even as costs escalated without firm explanation, and that the money was not finding its way to the subcontractors. The evidence was not unfairly prejudicial.
D. Failure to Object to Benes' Evidence
¶49 The State asked Benes if he was aware that Homeowner Wife was dissatisfied with Pierce's documentation attempting to justify the rising cost of the project; Benes answered, "That's my understanding, correct." Pierce asserts that counsel should have objected that Benes' answer was inadmissible hearsay.
¶50 The issue of ultimate fact was whether Pierce actually used Homeowners' money for nonproject purposes, not whether they suspected that he did. Even if counsel erred by not objecting on hearsay grounds and that bit of Benes' testimony had been excluded, there was significant other evidence for the jury to conclude that Pierce adjusted the books to hide the fact that the subs were not being paid. Pierce once again has not established a reasonable probability that, but for the claimed error, the result of the proceeding would have been different.
E. Failure to Rebut Homeowner Wife's Testimony Regarding Arbitration
¶51 Homeowner Wife testified that she did not avail herself of the contract's arbitration clause because Pierce was in Costa Rica. Pierce contends he hired an attorney to represent him in civil matters related to the project, that the attorney requested arbitration, and that he and the attorney were in regular contact via e-mail and phone. The State argued to the jury, "How do you arbitrate with somebody who's on the run in Costa Rica?" Pierce contends counsel's failure to counter Homeowner Wife's testimony by "presenting a witness" to show that arbitration was proposed unfairly suggests that he showed consciousness of guilt.
¶52 Pierce does not identify the witness or state what the witness would have said. A defendant who alleges a failure to investigate must allege with specificity not only what the investigation would have revealed, but how it would have altered the outcome of the trial. State v. Flynn , 190 Wis. 2d 31, 48, 527 N.W.2d 343 (Ct. App. 1994) (citation omitted). Regardless of whether Homeowners pursued arbitration, the State still could have argued that Pierce's actions showed consciousness of guilt because he abandoned the contract and spent at least three years in Costa Rica not answering the State's charges against him. As with his other ineffectiveness claims, Pierce has not met the Strickland standard for prejudice.
IV. Cumulative Prejudicial Effect
¶53 Pierce next argues he is entitled to a new trial due to the cumulative prejudicial effect of counsel's errors. We have rejected most of Pierce's claims of error. Even where counsel might have objected to or not elicited certain evidence, Pierce has failed to show a reasonable probability that the result of the proceeding would have been different. Where the evidence against the defendant is compelling, "even unreasonable errors[ ] will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial." See Thiel , 264 Wis. 2d 571, ¶61. That is the case here.
V. New Trial in the Interest of Justice
¶54 Pierce contends he is entitled to a new trial in the interest of justice on grounds that the real controversy was not fully tried. See WIS. STAT. § 752.35. A court may conclude that the real controversy has not been fully tried when the jury hears evidence it should not have heard or the jury is deprived of evidence it should have heard. State v. Schumacher , 144 Wis. 2d 388, 400, 424 N.W.2d 672 (1988).
¶55 While the authority to grant a new trial when the real controversy has not been fully tried does not require a showing that the new trial likely would produce a different outcome, State v. Williams , 2006 WI App 212, ¶36, 296 Wis. 2d 834, 723 N.W.2d 719, our discretionary reversal power to grant a new trial in the interest of justice is to be exercised "infrequently and judiciously," and only in "exceptional cases," State v. Avery , 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60. Pierce has not persuaded us that his is an "exceptional" case.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

The Honorable Steven A. Simanek presided over the trial and sentencing. The Honorable Daniel Steven Johnson presided over the postconviction motion hearings.

Pursuant to Wis. Stat. § 809.86 (2017-18), we will shield the identity of the property owners, the crime victims in this case. Where necessary to distinguish, we will use "Homeowner Husband" or "Homeowner Wife." Pierce dealt almost exclusively with Homeowner Wife, who has extensive business experience.
All references to the Wisconsin Statutes are to the 2017-18 version unless noted.

A DNA surcharge had been ordered for each of the six convictions. Pierce's postconviction motion sought to have five of them removed and to have the judgment of conviction amended to reflect the stipulated amount of restitution. The court granted both requests. Pierce does not challenge those rulings on appeal.