COURT OF APPEALS
DECISION
DATED AND FILED

March 17, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP816-CR**

Cir. Ct. No. **2014CF113**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

NICHOLAS D. TUINSTRA,

    DEFENDANT-APPELLANT.

       APPEAL from a judgment and an order of the circuit court for Green Lake County:  MARK T. SLATE, Judge.  *Affirmed*.

       Before Neubauer, C.J., Reilly, P.J., and Davis, J.

       **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Nicholas D. Tuinstra appeals from a judgment of conviction for two counts of first-degree intentional homicide and one count of stalking resulting in bodily harm, by use of a dangerous weapon, as an act of domestic abuse. Tuinstra also appeals from an order denying his postconviction motion. He argues that he is entitled to a new trial because the trial court erroneously "deferr[ed] to the sheriff's request" to have the defendant in leg shackles during the jury trial and because the two attorneys who represented Tuinstra provided ineffective assistance in numerous ways.[1] We reject his arguments and affirm.

## BACKGROUND

¶2 On a Saturday night in September 2014, Tuinstra's estranged wife, Melissa Tuinstra (hereafter, "Melissa"), and her boyfriend, Justin Daniels, were shot multiple times at Melissa's apartment building, causing their deaths. Melissa's body was found on the sidewalk outside her apartment building by customers leaving a bar. Daniels' body was subsequently discovered inside the building, at the entrance to Melissa's apartment.

¶3 The next morning, an investigator interviewed Tuinstra, who told her that he had never been to Melissa's apartment except to drop off their daughter outside the building. In that recorded interview, Tuinstra said the last time he spoke with Melissa was at about 9:00 p.m. the night before when he called to talk with her after having a bad dream. He said Melissa told him that he was "just

---

[1] Some of Tuinstra's allegations of ineffective assistance relate to both attorneys, while other allegations are specific to the attorney who cross-examined particular witnesses. For ease of reference, we will refer to "trial counsel" in the singular throughout this decision.

2

having an anxiety attack" and should go to his mother's house. Tuinstra told the investigator he could hear Daniels in the background when he spoke with Melissa. Tuinstra said after talking with Melissa, he got into his car and drove to his parents' house, where his daughter was staying the night, arriving at approximately 10:00 p.m.

¶4 When Tuinstra was asked about guns that he owned, he identified four guns that he had recently taken to his parents' house for safekeeping. Notably, the guns Tuinstra mentioned did not include a 9mm gun, which was the type used in the homicides. Tuinstra said he had traded guns in the past, and the last time he had done so was "last year maybe." At the conclusion of the interview, Tuinstra was allowed to leave the police station and was not immediately charged with any crimes.

¶5 Two days after his first interview with the police, Tuinstra was served with a search warrant so officers could collect his DNA and fingerprints. Tuinstra said that he "just wanted to fill a few gaps" in his statement. Tuinstra participated in another recorded interview with the same investigator and a captain (collectively, "the officers").

¶6 Tuinstra told the officers that Melissa used to shoot guns with him and that in the days before her death, Tuinstra gave Melissa a Beretta 9mm gun that he had acquired after trading in another gun. Tuinstra said he also gave Melissa a fifteen-round magazine for the gun. The officers told Tuinstra they did not believe him, and they shared information that had been gathered in the days since Tuinstra's first interview. For instance, cell phone records indicated that the night Melissa and Daniels were killed, Tuinstra called and spoke with Melissa twice, at 9:45 p.m. and again a few minutes later. The officers told Tuinstra that

after the first call, Melissa texted Tuinstra, "Not tonight, in the morning." Her last text to him, at 9:58 p.m., stated, "Please and sorry."

¶7 The officers also told Tuinstra they had a recording of gunshots being fired at 10:14 p.m., so they knew that Melissa and Daniels died about fifteen minutes after Tuinstra spoke with Melissa. Confronted with this information, Tuinstra admitted that he walked ten minutes from his home to Melissa's apartment. He said he tried to talk to Melissa, who was on the stairs leading to her apartment, at the same time that Daniels was standing at the door of the apartment, asking Melissa to come back in. Tuinstra said that after Daniels closed the door to the apartment, Tuinstra heard a noise "like something was being cocked … like he was playing with their gun or door lock."

¶8 When officers asked what happened next, Tuinstra indicated that he wanted to "say the rest with an attorney." The officers ended the interview, and Tuinstra did not give any subsequent interviews to the police.

¶9 Tuinstra was charged with two counts of first-degree intentional homicide. After extensive pretrial litigation, during which the State added one count of stalking, the case proceeded to a jury trial.

¶10 At the six-day trial, the State presented evidence concerning the two homicides and Tuinstra's relationship with Melissa. The State argued that Tuinstra displayed controlling behavior and stalked Melissa after she left him less than a month before the homicides. The State also played for the jury the two videotaped interviews that Tuinstra gave to the police. In addition, the State introduced purchase records and testimony concerning the Beretta 9mm gun that Tuinstra purchased in July 2014, which was never found even after the police searched Tuinstra's home, his parents' home, and Melissa's apartment.

¶11 Tuinstra did not testify at trial. In her closing argument, trial counsel questioned the State's time line for the homicides, suggesting that Tuinstra may have gone to speak with Melissa at her apartment before the two spoke on the phone. Trial counsel argued that it is unlikely Tuinstra could have shot the victims, walked home, changed clothes, disposed of evidence, and driven to his parents' house by 11:10 p.m., the time a neighbor's surveillance camera filmed Tuinstra's car arriving. Trial counsel also disputed the State's suggestion that Tuinstra stalked Melissa, and she emphasized that there was no DNA or other physical evidence that Tuinstra had been present for the shootings.

¶12 The jury found Tuinstra guilty of all charges. The trial court sentenced Tuinstra to two consecutive life terms without the possibility of extended supervision, and it imposed a concurrent eight-year sentence for the stalking count.

¶13 Represented by postconviction counsel, Tuinstra filed a postconviction motion seeking a new trial on numerous grounds, including ineffective assistance of counsel. Over four days, the trial court heard testimony from numerous witnesses, including the two attorneys who represented Tuinstra at trial. Ultimately, the trial court denied Tuinstra's motion in a written decision. This appeal follows.

**DISCUSSION**

¶14 Tuinstra argues that he is entitled to a new trial because the trial court erroneously "deferr[ed] to the sheriff's request" to have the defendant in leg shackles during the jury trial and because his trial counsel provided ineffective

5

assistance in multiple ways.[2]  For reasons explained below, we reject Tuinstra's arguments and affirm.

## I. Use of leg shackles at trial

¶15    Prior to trial, Tuinstra filed a motion in limine seeking, among other things, an order allowing him "to appear in court in street clothing and without shackles or handcuffs because his appearance in jail clothing and restraints would unduly prejudice the defendant."  At a pretrial conference two weeks before the trial, the State did not object to Tuinstra's request to appear in street clothes, and it expressed no preference concerning shackles or handcuffs, stating:  "I leave security arrangements to the people who are professionals."

¶16    The trial court said that it had spoken with the sheriff's department, which was recommending the use of leg shackles.  The trial court acknowledged that Tuinstra did not want any restraints, but it said that it wanted to "defer to the sheriff's department as to what they believe is in the best interest of everybody involved."  The trial court continued:  "I can override them, but I'm only going to do so with a very good reason.  And I guess I leave that up—that's kind of the tentative ruling is civilian clothes, he will have shackles on his feet."  The trial court also described the procedures that it would use during the trial to ensure that the jurors did not see the shackles, including how they would enter the courtroom during voir dire.  The trial court said that "[i]f the defense wants to argue it or come up with something else," it could do so on the Friday before the trial, when

---

[2] Tuinstra has not pursued all of the issues he raised in his postconviction motion.  Those unbriefed issues are deemed abandoned and we will not discuss them.  *See* ***Reiman Assocs., Inc. v. R/A Advert., Inc.***, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292 (Ct. App. 1981) (holding that issues not briefed are deemed abandoned).

the parties were already scheduled to appear for a hearing. It is undisputed that Tuinstra did not ask the trial court to reconsider its "tentative ruling" that Tuinstra would have shackles on his legs.

¶17　On appeal, Tuinstra argues that the trial court "erroneously exercised its discretion by deferring to the sheriff's department decision that the defendant should be shackled during trial." He further argues that the trial court's "shackling decision violated [his] right to a fair trial." We are not persuaded that Tuinstra is entitled to relief.

¶18　"[I]n the exercise of its discretion, a [trial] court may require restraints when 'they are necessary to maintain order, decorum, and safety in the courtroom.'" *State v. Ziegler*, 2012 WI 73, ¶84, 342 Wis. 2d 256, 816 N.W.2d 238 (citation omitted). *Ziegler* held that the extent to which the trial court needs to address the reasons for restraints depends on whether the restraints are visible to the jury. *See id.*, ¶86 (holding that when the restraints are not visible to the jury, the trial court is not required "to inquire into the necessity of hidden restraints" (citation omitted)).

¶19　Here, the trial court took steps to ensure that the leg shackles were not visible to the jury, and Tuinstra does not assert that the jurors saw the leg shackles. Therefore, under *Ziegler*, the trial court was not required to delve into the reasons for those restraints. *See id.* Nonetheless, the trial court briefly considered the issue in response to Tuinstra's motion in limine. The trial court explained that while it generally defers to the sheriff's department's advice, it was open to changing its "tentative decision" if the defense offered a good reason for doing so. Trial counsel did not again raise the issue. We cannot fault the trial

court for not revisiting the use of leg shackles when the defense chose not to offer arguments why it should do so.

¶20    Moreover, when Tuinstra questioned the trial court's leg shackling decision in postconviction proceedings, the trial court had an opportunity to further explain why it had decided to follow the sheriff's department's advice. It said that "[l]eg shackles are considered the least restrictive security measure the [c]ourt has access to in Green Lake County" and that they were appropriate for Tuinstra, "a person charged with two very violent, horrific crimes, who had a $1,000,000.00 cash bond." We agree with the State that those reasons supported the trial court's exercise of discretion.

## II. Ineffective assistance of counsel

¶21    Tuinstra asserts that trial counsel performed deficiently in eleven ways and that he was prejudiced by those deficiencies, both individually and cumulatively. "Whether a defendant received ineffective assistance of counsel presents a mixed question of law and fact." *State v. Domke*, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364. On appeal, we will uphold the trial court's "findings of fact, including the circumstances of the case and the counsel's conduct and strategy, unless they are clearly erroneous." *Id.* (citation omitted).

¶22    A defendant who seeks to establish that he was denied the constitutional right to effective assistance of counsel "must prove two elements: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We need not address both prongs of the test if the defendant fails to make a sufficient showing on either one. *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

¶23 To establish deficient performance, a defendant must show specific acts or omissions of counsel that were "outside the wide range of professionally competent assistance." *Id.* at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

¶24 "To prove prejudice, a defendant must establish that 'particular errors of counsel were unreasonable' and 'that they actually had an adverse effect on the defense.'" *Scholar*, 381 Wis. 2d 560, ¶33 (quoting *Strickland*, 466 U.S. at 693) (emphasis omitted). Our supreme court has explained:

> To establish prejudice the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. We examine the totality of the circumstances to determine whether counsel's errors, in the context of the entire case, deprived the defendant a fair trial. It is not sufficient for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the proceeding.

*Domke*, 337 Wis. 2d 268, ¶54 (citation omitted). In addition, "when a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice." *State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305.

¶25　With those legal standards in mind, we turn to Tuinstra's ineffective assistance claims. The first claim relates to a change in courtroom security that occurred on the third day of the trial. The State raised concerns about a recorded conversation that Tuinstra had with his father the previous night, during which Tuinstra indicated that he was "going to try something here and see what happens" and also referred to a mistrial.[3] Ultimately, to address security concerns about Tuinstra's comments, the table at which Tuinstra was sitting was moved slightly and an additional deputy sat near Tuinstra.

¶26　According to trial counsel's testimony at the postconviction motion hearing, the decision to move the table and add an additional deputy was the result of a plan worked out when trial counsel, the State, and representatives of the sheriff's department met privately to discuss the need for additional security measures in light of Tuinstra's statements. Trial counsel said that "originally, they wanted him in wrist shackles," but she objected to both that idea and a proposal to turn Tuinstra's table so that he would be on the end, directly facing the jury. Trial counsel said she concluded that the agreement she reached with the State and the sheriff's department—which the trial court later accepted—was "the best possible result out of everything that we had discussed." She testified that she was satisfied with the agreement and did not think the changes were "anything that was noticeable to the jury." She added: "It was a good compromise." Trial counsel said she did not "think it made much difference" for Tuinstra to be moved slightly farther away from her.

---

[3] At the postconviction hearing, Tuinstra asserted that when he spoke with his father, he was referencing his plan to fire his attorneys, not suggesting that he was going to cause a disturbance. We need not determine the meaning of Tuinstra's statements to resolve his ineffective assistance claim.

¶27 In its written decision, the trial court found "that the security measures of slightly turning the table that the defendant was seated at, and adding an additional deputy were insignificant." The trial court concluded that trial counsel was not deficient for failing to object to those changes, adding: "It could be argued that to object to such a minor change could be ineffective," because if the parties had not reached an agreement, the trial court "could have made much more significant changes … that could have affected the communication between the defendant and his attorneys and would have been noticeable to the jurors." The trial court indicated that "significant deference should be afforded to [the decisions of] trial counsel."

¶28 We agree with the trial court that Tuinstra has not shown that trial counsel performed deficiently with respect to the security changes. Trial counsel assessed the concerns of the State and the sheriff's department, advocated against shackling Tuinstra's hands and turning his table to face the jury, and agreed to changes that the trial court later found were insignificant. Tuinstra has not overcome the presumption that trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *See Strickland*, 466 U.S. at 690.

¶29 Next, we turn to Tuinstra's second allegation of ineffective assistance. Tuinstra argues that trial counsel failed to adequately research the State's domestic violence expert and utilize an independent expert to dispute what Tuinstra asserts were inaccurate statistics about domestic violence.[4] The trial

---

[4] Although the State originally wanted its expert to testify about domestic violence and Tuinstra's actions, the trial court granted Tuinstra's motion to limit the expert's testimony to generalities of domestic violence.

court found that trial counsel did not perform deficiently because she made a strategic decision to focus on the fact that Tuinstra did not commit the crimes, rather than draw attention to the domestic violence issue by calling a different expert to refute the State's expert.

¶30 We decline to address whether trial counsel performed deficiently, because Tuinstra has not shown that he was prejudiced by trial counsel's failure to refute the expert's testimony or by any of the other alleged errors in trial counsel's performance.[5] *See id.* at 697.

¶31 The trial court's written decision analyzes key trial evidence that supported the State's theory that Tuinstra stalked Melissa and shot both Melissa and Daniels. For instance, Tuinstra's neighbor testified that he overheard a phone conversation between Tuinstra and Daniels where Tuinstra said, "[I]f I find you, I am going to kill you." In addition, Tuinstra "had access to guns, and he practiced shooting them regularly." The trial court noted: "The autopsies confirmed that 13 of 14 shots hit the bodies of Melissa and [Daniels], and nine of the shots were fatal wounds." Further, the Beretta 9mm handgun that Tuinstra purchased two and one-half months before the homicides was never found; a search of Tuinstra's home uncovered only the empty box for the gun.

---

[5] Tuinstra argues that trial counsel performed deficiently by failing to: (1) introduce "selfies" of Melissa to rebut witnesses' claims that her neck was bruised, (2) introduce text messages from Melissa to Daniels to provide an alternate theory for bruises on Melissa and a motive for her to lie about Tuinstra, (3) elicit testimony from Tuinstra's divorce lawyer concerning Melissa's demeanor toward Tuinstra, (4) object to hearsay statements about Tuinstra's alleged threat to commit suicide, (5) object to hearsay statements in Melissa's journals, (6) object to hearsay statements that Melissa told a friend she would not call the police because she feared what Tuinstra would do, (7) object to a friend's statement about the reason she shared a Facebook message with Melissa, (8) impeach a witness with a Facebook conversation, and (9) object to certain questions asked of Melissa's friend.

¶32     The trial court's decision also discussed the night Melissa and Daniels were shot. Tuinstra admitted that he spoke with Melissa by phone and text, although a forensic analysis of Tuinstra's phone revealed that "he had deleted certain content," including his contacts with Melissa on the night of her death. The police were able to pinpoint the time of the homicides by listening to a voice mail message Daniels left for a friend at 10:14 p.m. That recorded message contained only the sounds of gunshots, "a door slamming," and then silence, indicating that Daniels and Melissa were shot "only minutes after [Tuinstra] would have arrived after walking to Melissa's apartment from his house."

¶33     The trial court discussed Tuinstra's statements to the police. In the first interview, Tuinstra "did not reveal that he owned a 9mm handgun," even though he was asked—twice—to list all of his guns. Further, Tuinstra claimed in his first interview that he had never been to Melissa's apartment, but in his second interview, he admitted that he went to the apartment the night of the homicides.

¶34     Ultimately, the trial court concluded that the numerous alleged deficiencies of trial counsel did not "undermine confidence in the reliability of the result of the trial" and that there was not "a reasonable probability that a jury viewing the evidence untainted by counsel's errors would have had a reasonable doubt respecting guilt."

¶35     On appeal, Tuinstra alleges that he was prejudiced by trial counsel's alleged deficiencies, both individually and cumulatively, but he does not directly address the trial court's prejudice analysis. For instance, he argues that trial counsel's failure to challenge the State's domestic violence expert allowed the State to "paint[] a frightening picture of domestic violence as an out of control epidemic using statistics of dubious validity." Similarly, when Tuinstra argues

that trial counsel should have objected to the introduction of Melissa's hearsay statements to a friend about her fear of Tuinstra, he asserts: "It was unfairly prejudicial and would have negatively affected the jurors' view of Tuinstra." However, Tuinstra does not adequately explain how a more robust examination of the State's domestic violence expert or the exclusion of numerous hearsay statements would have affected the remaining evidence that the trial court discussed in its prejudice analysis. Tuinstra's arguments are insufficient to demonstrate prejudice as defined by *Strickland* and its progeny.

¶36 We have reviewed the entire record in this case, including the trial court's detailed summary of the evidence against Tuinstra. Having "examine[d] the totality of the circumstances to determine whether counsel's errors, in the context of the entire case, deprived the defendant a fair trial," we conclude that Tuinstra has not shown that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *See Domke*, 337 Wis. 2d 268, ¶54 (citation omitted). Whether we consider the alleged errors individually or cumulatively, Tuinstra has not established prejudice. Therefore, he is not entitled to a new trial based on his allegations that trial counsel provided ineffective assistance.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

14